[No. S027264. July 20, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK WAYNE FRIEND, Defendant and Appellant.

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Denise Anton and Evan Young, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega, Glenn R. Pruden and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BAXTER, J.—On January 12, 1989, an Alameda County jury found defendant Jack Wayne Friend guilty of first degree murder and robbery. (Pen. Code, §§ 187, 189, 211.)[1] The jury also found true that he had inflicted great bodily injury in connection with the robbery and that he had personally used a knife in committing both crimes. (§§ 12022.7, subd. (a), 12022, subd. (b).) The jury was unable to reach a verdict on the robbery-murder special-circumstance allegation. (§ 190.2, former subd. (a)(17)(i).) After a retrial on the robbery-murder special-circumstance allegation, a new jury found it true on March 20, 1992. After the penalty phase, the jury returned a verdict of death on April 17, 1992. The trial court denied defendant's motion for new trial and modification of the penalty (§ 190.4, subd. (e)), and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We will affirm the judgment in full.

### INTRODUCTION

Around midnight on Labor Day 1984, Herbert Pierucci, a bartender at the Golden West Bar in downtown Oakland, was fatally stabbed and cash was stolen from the bar. Defendant acknowledged at trial that he and an acquaintance, Gene Hollowhornbear, were the last two people in the bar that night, and the last ones to see the victim before the robbery.

The prosecution's main witness was Kevin Kelley, who had been with defendant and Hollowhornbear at the bar earlier in the evening but who left before the crime. Kelley testified that he saw defendant and Hollowhornbear emerge from the bar with defendant holding a knife, and that defendant later admitted to Kelley that he had committed the robbery murder. Another prosecution witness, Thomas Moody, also testified that defendant had admitted he committed the robbery murder.

The defense contested Kelley's credibility, especially whether Kelley could have seen defendant from the distance at which he claimed to be standing. Defendant took the stand in his own defense and testified that Hollowhornbear and the victim had gotten into a fight, that defendant had tried to break it up, but Hollowhornbear pulled a knife and fatally stabbed the victim.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. *First Trial: Guilt Phase*

#### 1. *The Prosecution's Case*

##### a. *Discovery of the Victim and Nature of the Wounds*

The victim, Herbert Pierucci, worked as a bartender at the Golden West Bar, which was located at 368 12th Street between Franklin and Webster Streets in downtown Oakland. Around midnight on Labor Day, September 3, 1984, two acquaintances of the victim discovered him alone, lying in a pool of blood at the back of the bar. The front cash register was open, the cash drawer was pulled out, and its contents, later estimated to be approximately $300, were missing. Four bottles of liquor were also gone.

A police officer summoned to the scene found the victim semiconscious with a four-inch gash to his neck and a three-inch gash to his wrist. Asked what had happened, Pierucci answered that he had been stabbed. The officer asked, "how many people were there?" and Pierucci held up two fingers in response.

Pierucci was taken to the hospital, where emergency surgery was performed, but he died four days later from loss of blood. The surgeon who operated on Pierucci testified that, in one of the front wounds, the knife completely severed the sternomastoid muscle in the neck and came to rest on the cervical spine. Three wounds at the back of the neck completely severed the trapezius muscle. The surgeon testified that a fair amount of pressure was required to inflict such wounds. The pathologist testified that there were at least six distinct sharp cutting wounds to the victim's neck and defensive wounds to his left arm and right and left hands.

##### b. *Testimony of Kevin Kelley*

On September 3, 1984, Kevin Kelley, defendant, and Thomas Moody were among a group of homeless alcoholics who were allowed by owner Dina Mladinich to stay at the Thomas Janitorial Supply Warehouse (the warehouse) on the corner of Ninth and Alice Streets.[2] About 10:00 p.m., Kelley and defendant left the warehouse and headed towards downtown Oakland. Defendant wore a black nylon "security-type" jacket, blue jeans, and black shoes. They went in search of Mladinich's van, which Moody had borrowed.

---

[2] Other testimony established that about seven people were staying in the warehouse around the time of the murder.

On the way, they met Gene Hollowhornbear, who was carrying a black nylon gym bag that was half full of clothes.[3] The group discussed getting a six-pack of beer at a nearby convenience store, the Oasis, but defendant did not want to go there because he had gotten into trouble there in the past. Instead, they decided to go to the Golden West Bar, where they initially sat in the front section of the bar and defendant ordered a round of beers.

The group moved to the rear of the bar and played pool. Kelley and Hollowhornbear drank two more beers, and defendant drank three more. Kelley went to the bathroom and defendant followed him in. Defendant proposed to Kelley that they rob the bar by hitting the bartender with a bottle, stating it would be an easy three-on-one robbery. Defendant also mentioned using one of defendant's knives for the robbery. Earlier at the bar, Kelley had noticed that defendant had two knife sheaths on the back of his belt. Kelley recognized one of the knives as a Buck-type knife that Kelley had sold to defendant about three weeks earlier.[4] Defendant's other knife looked like a Benchmark-type knife and had the word "raccoon" engraved on it.[5]

Kelley said he did not want to have anything to do with a robbery. He went back to finish his drink, and then headed out of the bar. As Kelley was stepping out the door, defendant again tried to convince him to join in the robbery, but Kelley reiterated that he wanted no part in it. At the time Kelley left the bar, defendant and Hollowhornbear were the only ones there besides the bartender.

After leaving, Kelley walked eastbound on 12th Street towards Webster Street. He crossed this intersection and continued east on the south side of 12th Street towards the next cross-street, which was Harrison. He passed the Cochran and Celli automobile dealership, and was about three-quarters of the way down this block of 12th Street between Webster and Harrison when he stopped to look back. He saw that defendant and Hollowhornbear were on the sidewalk in front of the Golden West Bar. The street was well lit by several street lights. Defendant was holding a shiny object in his hand, which Kelley thought was a knife. Hollowhornbear was holding his black nylon gym bag. They proceeded to the nearby corner of 12th and Webster. Defendant wiped the knife on his pants and on a bag he took from the gutter.[6]

---

[3] Other testimony established that Hollowhornbear was a Native American alcoholic who often lived on the streets.

[4] Other testimony established that this was actually a Case brand knife; Buck and Case brand knives are essentially the same.

[5] Other testimony established that defendant's nickname was Raccoon.

[6] A police officer searching the scene after the murder found a bag with what appeared to be blood spots on it approximately 50 to 75 feet from the front door of the Golden West Bar.

Kelley started walking towards them, but then decided he wanted to get away, and turned the corner and began walking down Webster Street toward 13th Street. After turning right on 13th Street, he reached Harrison Street and started crossing a parking lot. Defendant and Hollowhornbear followed and caught up with him in the parking lot, where Hollowhornbear handed Kelley a bottle with a pour spout on it, and asked him to hold it for a second. Kelley held it for a while and then threw the bottle into some nearby bushes. Kelley noticed that Hollowhornbear's gym bag contained between four and six bottles, some of which had spouts on them and appeared to be bar bottles. After tossing the bottle, Kelley jogged back to the warehouse on his own.

Five to 10 minutes after Kelley returned to the warehouse, defendant arrived. Someone else was using the bathroom sink, so defendant started washing his hands in the toilet bowl. Defendant began changing clothes, and asked where his glove was. Kelley later saw a clear surgical glove lying on the floor near the toilet.[7] The lights were on in the warehouse and Kelley noticed some dark splotches on defendant's jeans, between his waist and his knees, which had not been there before they went to the Golden West Bar.

Five minutes after defendant, Hollowhornbear also arrived at the warehouse. Kelley did not notice any stains or splotches on Hollowhornbear. Hollowhornbear had his black gym bag, which was still full of bottles. He removed approximately six bottles from the bag, three of which had spouts on them, and began drinking from one. Defendant told Hollowhornbear to change his clothes, but Kelley never saw Hollowhornbear change.

After defendant changed his clothes, he said he wanted to get rid of his old clothes by dumping them in "the deep, deep water." Defendant made a bundle of the clothes by tying the arms of the black security-type jacket around them. With defendant carrying the bundle, defendant and Kelley went outside. Defendant said he wanted to stash his knife, threw the bundle of clothes to Kelley, and then departed for five minutes. Defendant returned and retrieved the bundle, and they went to the estuary. They came to a large restaurant located on the water at Jack London Square.[8] Kelley waited at one corner of the building while defendant went around the building the other way carrying the bundle. Kelley could not see where defendant went. Three to five minutes later, defendant returned without the bundle.

They went to another restaurant in Jack London Square, the Jack London Inn, where defendant ordered a round of beers. A man was singing and

---

[7] Prior to that evening, defendant had injured his hand and had been wearing a white wrap bandage, although Kelley could not remember whether defendant wore it that night at the bar.

[8] The prosecutor identified this restaurant, using a street diagram. Kelley agreed to this identification.

playing piano at the bar. Defendant went to the restroom, and Kelley followed a few minutes later. Kelley used the urinal and saw that defendant was in the stall. Kelley returned to the bar, but eventually came back to use the restroom a second time. Although the toilet had overflowed, defendant was still in the stall and was counting his money. Kelley saw bills of different denominations, $1's and $5's, in the water on the floor. There was also a broken roll of quarters on the floor. Kelley heard defendant say, "I killed him for a measly hundred and something dollars." Defendant said he had left "the big bills" in the black security-type jacket he had thrown in the estuary.

Defendant gave Kelley some quarters from the broken roll (amounting to about $7 or $8), which Kelley used to buy a beer. They then went to the restaurant area to eat, and defendant ordered two steak dinners. Kelley could not eat very much. After they left the restaurant, they returned in a zigzag manner to the warehouse. Kelley recalled looking up and seeing a building clock indicating 1:45. While they were walking back, defendant said he had to kill the bartender because the bartender knew him and defendant did not want any witnesses. When they returned to the warehouse, Hollowhornbear was still there but left shortly thereafter. Kelley slept until about 6:00 a.m., and then took BART (Bay Area Rapid Transit) to his brother's house in Fremont and stayed there. Kelley did not talk again with either defendant or Hollowhornbear.

A little over a month later, on October 15, 1984, police officers took Kelley from his brother's house to the police station for questioning. Kelley agreed to talk to the police and the district attorney. The Alameda County District Attorney's Office provided Kelley with a place to stay, some food, and $110 a week in cash for six weeks, from February 14, 1985, to March 31, 1985.

c. *Testimony of Thomas Moody*

Thomas Moody was a longtime resident of the warehouse, and was living there, along with defendant and Kelley, on the day of the murder. During the early evening, Moody had taken Mladinich's van to be serviced at the gas station around the corner. Moody then visited a friend, had something to drink, and returned to the warehouse around 10:30 p.m., in an inebriated condition. Defendant and Mladinich were there when he returned. Mladinich yelled at Moody for taking the van and, about half an hour after that, he went to sleep.

On either the day after the murder, or the day after that, Moody talked to defendant about the knife that Kelley had sold to defendant. Moody asked defendant to sell him the knife (an offer that Moody had first raised a week or two earlier). But defendant now told him that he had gotten rid of the knife.

After the murder, police began coming to the warehouse to investigate. After these police visits, Moody saw defendant talk to Dennis French, another resident of the warehouse, and then saw defendant pack up his clothes and leave. About two weeks later, Moody saw defendant back at the warehouse and Moody asked him what he had done. Defendant said that he had robbed the Golden West Bar, sliced the bartender's neck, and stabbed him. Defendant said he used the knife he bought from Kelley, which he then ditched. Defendant said that he took all the money, around $280, from the cash register, and that Hollowhornbear had been with him at the bar. After the crime, they stole a station wagon from downtown Oakland and "partied the money off."[9] Asked why he had done it, defendant replied, "You got to do what you got to do."

A few weeks after his conversation with defendant, on October 4, 1984, Moody was taken into custody by police outside the warehouse based on outstanding warrants unrelated to the murder.[10] At first, Moody denied any knowledge of the murder, but eventually he told the police about defendant's admissions. Moody stated he had not initially told police about defendant because he was afraid of defendant's brother, Jerry, who he knew was out of jail and who had stabbed someone before. The day after he talked with police, the district attorney's office made arrangements to house Moody at a motel in Hayward. Moody stayed there approximately five months. The district attorney's office made weekly payments of $70 for rent and $40 for food for 22 weeks, for a total of $2,420.

### d. *Testimony of Leonard Ray McCurry*

For the first two or three months of 1985, Leonard Ray McCurry was in the protective custody unit of the Oakland North County Jail, in Alameda County, serving a five-year sentence for felony robbery. He was housed in the cell next to defendant, and the two talked. Defendant told McCurry that he had been in a bar with two other individuals and that they had gone into the bathroom and discussed robbing the bar. One of the two said he did not want to participate and left. Defendant and the other one, an "Indian named 'Hornblower [sic],' " robbed the bartender. Defendant realized the bartender would recognize him, so he cut the victim's throat using his left hand, even though he is right handed. In early April 1985, McCurry talked to the

---

[9] During the defense case, the parties stipulated that the prosecution and the defense had examined all police reports logged at the Oakland Police Department auto theft detail for automobiles that had been reported stolen in Oakland on September 4 through 6, 1984, and that none of them reported a station wagon stolen from downtown Oakland.

[10] On cross-examination, defense counsel introduced the warrants into evidence. They were for violating a domestic violence restraining order, unauthorized destruction of property within a dwelling, unauthorized entry of a dwelling, and battery.

authorities about defendant's statements. McCurry sought, but did not receive, a lesser sentence in exchange for this information about defendant.

At the time McCurry testified at defendant's trial, he was in custody on a parole violation. The prosecutor had promised McCurry that, if he testified, he would be removed from his current prison (Deuel Vocational Institution in Tracy), put in protective custody in Santa Rita Jail, and allowed to serve the remaining 32 days of his time there. He was also allowed to have a contact visit with his wife and his newborn daughter.

On cross-examination, McCurry stated that defendant gave him information knowing McCurry was going to take it to the authorities in order to seek a better sentence. Defendant and McCurry worked together in figuring out which information might interest the authorities, and defendant wrote a letter to give McCurry something tangible to present. The letter was addressed to fictitious persons asking them to establish an alibi for defendant on the night of the murder. Defendant also shared with McCurry the contents of defendant's legal papers, including police reports that may have contained the statements of Kelley and Moody. Defendant came up with the idea of giving McCurry information about defendant's case so that McCurry could take it to the authorities.

### e. *Defendant's Statements to the Police*

After defendant was arrested for the murder, he was informed of his *Miranda* rights, and agreed to talk to police investigators. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) Defendant initially denied any knowledge of or involvement in the robbery murder. But the officers told him a witness had placed him at the bar, and they asked him how he would explain it if his fingerprints were found on the cash register.[11] Defendant admitted he had been at the bar and said he had previously denied it because he was afraid of Hollowhornbear and Hollowhornbear's brother.

Defendant's initial statements denying any involvement in the murder were not tape-recorded. After he admitted being at the bar and gave his version of the events the night of the murder, the officers questioned him on tape. The tape was played to the jury, and defendant's extensive taped interview included the following statements.[12] Defendant, Hollowhornbear, and Kelley were the last ones in the Golden West Bar the night of the murder. Kelley left to buy some marijuana and defendant never saw him again that night. The

---

[11] This was a bluff by the investigators. As the parties stipulated, none of the latent prints lifted from the bar matched defendant's or Hollowhornbear's.

[12] Defendant's version of events in the taped statement was substantially the same as his testimony at trial, recounted in detail in the next part.

bartender refused to serve Hollowhornbear, who had become drunk and belligerent, and told him and defendant to leave. Hollowhornbear went behind the bar and grabbed a bottle. The bartender went to stop him and the two began scuffling. Defendant tried to pull Hollowhornbear off the bartender, but let go when he saw that Hollowhornbear had a knife in his hand. Defendant panicked and ran out of the bar. When he was out on the street, defendant noticed that there was blood on his pants and shoes. The next day defendant discarded his bloody clothes in a trash can in the park. In the park, he encountered Hollowhornbear, who gave him $16, and expressed anger at defendant for running out on him at the bar.

### 2. Defense Case

#### a. Defendant's Testimony

Defendant testified in his own defense. On September 3, 1984, defendant was living at the warehouse. At 7:00 a.m. that day, defendant was picked up by his employer, and he worked until about 9:00 or 9:30 p.m. that evening doing foundation work on a house. While working that day, he injured his hand, and, as a result, he wore a white gauze pad held on with an Ace bandage and a green rubber glove with the fingers cut off. After finishing work, he was paid his usual daily wage of $25 to $30. His employer dropped him back at the warehouse and defendant went to the liquor store to buy two or three small bottles of mixed drinks, four cans of beer, and cigarettes. He returned to the warehouse and drank.

Around 10:30 p.m. he left the warehouse with Kelley. Kelley asked defendant to lend him some money to buy marijuana, offering to split the bag with him. They met up with Hollowhornbear. Hollowhornbear was about six feet six inches tall and lived on the streets. He had his possessions in a bag he always carried with him. He was drinking from a bottle of wine in a paper bag and appeared to be under the influence.

Kelley went off to buy the marijuana, and defendant talked to Hollowhornbear. Hollowhornbear's mother had just died. She had lived on a reservation in South Dakota and Hollowhornbear had been trying to raise money to travel to her funeral. He was angry because no one would give him any money. Defendant was carrying two knives with him that evening; one had his nickname, Raccoon, on it, and the other was the knife he had bought from Kelley. Defendant traded this latter knife to Hollowhornbear for a beaded Indian wristband and a Bic lighter. Kelley returned after about 10 minutes, but had been unable to procure any marijuana.

The three then went to the Golden West Bar to get a drink. Defendant put $20 on the bar and bought several rounds of drinks. Defendant tried to play

pool but had problems because he was blind in the left eye, and his other eye was light sensitive, and, as a result, he wore dark glasses. Kelley eventually left the bar, indicating that he was going to look for marijuana. After Kelley left, Hollowhornbear began to act belligerently and tried to order the bartender around. The bartender refused to serve Hollowhornbear any more drinks. Defendant urged the bartender to serve Hollowhornbear another beer because that would "mellow" him out, but the bartender refused and asked Hollowhornbear to leave, threatening to call the police if he did not. The bartender began walking toward a cab phone at the other end of the bar that had a direct line to the police station. Hollowhornbear headed for the door, but then got behind the bar and reached for one of the bottles. The bartender ran toward Hollowhornbear and they started wrestling. Defendant got behind Hollowhornbear and tried to pull him off the bartender. Hollowhornbear's arm flew back and knocked defendant to the floor. Defendant got up and once again tried to pull Hollowhornbear away. Hollowhornbear was holding the bartender by the hair and hitting him. As defendant tried to grab Hollowhornbear's arm, defendant saw a knife in Hollowhornbear's hand, which defendant believed was the one he had traded to him earlier in the evening. Defendant panicked and ran, initially running the wrong way towards the rear of the bar, and then turning around and running out the front door. Defendant grabbed a long-necked beer bottle on the way out, which he took back to the warehouse and remembered seeing the next morning.

After defendant left the bar he began running back to the warehouse. Pausing to catch his breath at one point, he noticed that there were dots of blood on the cuff of his pants and on his boots. When he returned to the warehouse he changed his clothing because it had blood on it, and also because he had urinated in his pants. Defendant had worn a denim jacket to the bar, which he kept (and was wearing when he was arrested about a month later). But he threw away his pants, socks, and boots in a Dumpster in Estuary Park the day after the killing. Defendant did not see either Kelley or Hollowhornbear at the warehouse that night.

The next day, defendant encountered Hollowhornbear at a park near the warehouse. Hollowhornbear gave defendant about $16. As they talked, Hollowhornbear indicated he was angry that defendant had "run out on him" at the bar. Hollowhornbear's hand was hurt and he had a bandanna on it. Hollowhornbear threatened that if anything happened to him, he or his brother, Seth, would kill defendant. Following his encounter with Hollowhornbear, defendant stopped staying at the warehouse and lived for four or five days in a hole under the sidewalk that was the remains of the basement of a demolished building. Defendant then went back to staying at the warehouse, where he was arrested on October 5, 1984. At the time of his arrest, defendant was on probation for two second degree burglaries to which he had pleaded guilty the year before.

After his arrest, defendant initially denied any knowledge of the killing at the Golden West Bar or knowing Hollowhornbear because he did not want to get involved and because he was afraid of Hollowhornbear's brother. After the police told him that Hollowhornbear had been arrested, he told the police what had happened.

Defendant denied the substance of Kelley's testimony. He denied that he ever suggested to Kelley that the three of them should rob the bar, denied ever robbing the bar, and denied taking any money or liquor bottles from the bar. He denied running with Kelley and Hollowhornbear back to the warehouse, hiding the knife, or going with Kelley to throw his clothes into the water at Jack London Square. He denied having a steak dinner with Kelley at the Jack London Inn the night of the murder. He denied cutting the throat of the victim or telling Kelley that he had done so. He acknowledged owning a black security-type jacket but stated it had been destroyed in a house fire prior to the night of the killing.

Defendant also denied the substance of Moody's testimony. Defendant denied telling Moody he had killed the bartender, robbed the Golden West Bar, stolen a car, and spent all the money from the robbery "partying." Defendant said he once told Moody that he had killed someone in Los Angeles in order to frighten Moody, but he had never actually killed anyone. He confirmed that Moody approached him about buying the knife that defendant had obtained from Kelley, but claimed Moody never had enough money to complete the deal.

Defendant acknowledged he had given information about his case to jailhouse informant McCurry, but denied telling McCurry that he robbed the Golden West Bar and cut the bartender's throat. Rather, defendant told McCurry those were statements that McCurry could tell the authorities defendant had made in order to obtain a deal from them. Defendant said he wrote a letter to a fictitious person asking for an alibi as part of the scheme to provide McCurry with material to obtain a deal. Defendant said he came up with the story about killing the bartender with his left hand in order to account for the fact that defendant's right hand was injured at the time.

### b. *Physical and Circumstantial Evidence*

A police officer testified that the day after the stabbing he searched streets surrounding the bar but did not find any bottles with bar spouts or any other evidence that might have come from the bar.

The hair found in the victim's hand matched the victim, not defendant.

The parties stipulated that the victim had a blood-alcohol concentration of .222 at the time of his injury. Dr. Thomas Rogers, a forensic pathologist, gave

his opinion as to the effects of alcohol on the human body. He testified that alcohol can impair a person's perception, coordination, and memory. Given the victim's blood-alcohol concentration, Rogers estimated the victim had drunk the equivalent of at least nine cans of beer. At that concentration, the victim was under the influence of alcohol in both a legal and medical sense, and his intoxication could have affected the reliability of his response to the question of how many people were involved in his stabbing.

Two investigators from the Alameda County Public Defender's Office, Terri La Beaux and Elizabeth Dea, testified that they measured the distances in the area of the Golden West Bar. One investigator stood in front of the bar waving some shiny objects (keys and a metal soda can), while the second walked down 12th Street noting their visibility from various distances. The second investigator testified that she could not see the shiny objects when she got as far as the intersection with Harrison Street.

The parties stipulated that Hollowhornbear's mother, Elizabeth Hollowhornbear, died on August 22, 1984, in South Dakota.

### c. *Impeachment of Prosecution Witnesses*

#### (1) *Kelley*

To contradict Kelley's testimony that he had left Oakland for his brother's house in Fremont the morning after the murder, the defense called Sharon McBride, a fellow alcoholic who knew defendant and Kelley. She testified that, a couple of days after Labor Day 1984, she saw Kelley drinking in a park in Oakland. A police officer testified that she had arrested McBride for public drunkenness in the park on September 6, 1984.

Bill Gregg, the general manager of the Jack London Inn, testified that (contrary to Kelley's testimony) in September 1984 no musicians or singers were employed at the Jack London Inn. The inn began to employ musicians in January 1985.

Robert Gannon, an inspector for the Alameda County District Attorney's Office, stated that, in February and March 1985, Gannon paid Kelley $110 a week for six weeks. Gannon testified that neither he nor any member of the district attorney's office promised Kelley immunity from prosecution in exchange for his testimony. However, Harold Boscovich, director of the victim/witness assistance program, acknowledged that his office's application to the state for additional funds indicated that Kelley had been given immunity for conspiracy to kill a bartender in a local bar. Boscovich stated

that his office typically would have received the information it used for the application from the district attorney's investigator.

### (2) *Moody*

Inspector Gannon stated that from October 1984 to March 1985, the district attorney's office paid Moody $110 a week, for a total of a little over $2,400. Gannon paid $70 to Moody's landlord and gave the remaining $40 directly to Moody. The district attorney's office relocated Moody from the warehouse and paid his rent because Moody feared harm from defendant's brother, who was out on parole.

When police brought Moody in for questioning, they were aware there was a warrant for his arrest, but they did not arrest him after they finished questioning him. The officer who checked Moody's warrant recalled it as being for a minor traffic violation.

Lothar Eissel testified that between 1985 and 1987 his daughter, Lola Eissel (also known as Lola Powers), lived with Moody. Lothar said Moody told him that he was a witness in a murder trial and that it made him "immuned [*sic*] to the law." At one point, Moody broke into the apartment he shared with Lola and got into a scuffle with Lothar. Moody was arrested, but then released two hours later.

Patrick Fitzgerald Robello testified that he had worked with Moody at a gas station and, in his opinion, Moody did not tell the truth.

### 3. *Prosecution Rebuttal Case*

#### a. *Kelley's Prior Consistent Statements About the Murder*

Kim Kelley, Kelley's sister-in-law, testified that Kelley came to her house in Fremont around Labor Day, September 3, 1984, or the day after. Kelley told her he had a problem in Oakland where he was living. He said he had been in a bar with a White male and a Native American male, and the White male asked him to help rob the bar. Kelley said he refused to rob the bar and left. He was walking away from the bar when he heard some noise and turned around to see people running out of the bar. The White male came running up to him; his clothes were full of blood and he had some money sticking out of his pockets. Kelley said that he went to the river with the White male, who dumped the money and the clothes into the water. The White male gave Kelley some money and told him to get out of town and not to talk to the police. Kelley rode BART to his sister-in-law's house with the money the White male gave him.

### b. *Kelley's Dealings with the Authorities*

Jerry Curtis was a deputy district attorney in October 1984, and filed the complaint against defendant in the case. Curtis advised the investigating officers that he was not going to charge Kelley. Curtis made no promises to Kelley concerning immunity from prosecution.

Retired Justice of the First District Court of Appeal Joanne Parrilli, then an Alameda County Superior Court judge, testified that, on October 15, 1984, when she was a deputy district attorney, she took a statement from Kelley. In her opinion, Kelley was a witness rather than a participant in the robbery murder. She never made any promises of immunity to Kelley.

Albert W. Meloling was assistant district attorney in charge of northern Alameda County, including Berkeley, Oakland, and Alameda. One of his responsibilities was reviewing all capital matters. He had no discussions with anyone regarding immunity from prosecution for Kelley.

Angela Backers was the prosecutor who was assigned to the preliminary hearing of defendant and Hollowhornbear. Kelley and Moody were among the witnesses she called. Backers never discussed immunity with Kelley. The district attorney's office never considered charging Kelley with any offense.

Recalled on rebuttal by the prosecutor, Inspector Gannon stated he never told Inspector Boscovich (of the victim/witness program) that Kelley was involved in a conspiracy to rob and murder a bartender at a local bar, nor did he ever tell Boscovich that Kelley had been granted immunity. Gannon reiterated that he had not made any promises or representations to Kelley that he would be given immunity.

### c. *Moody's Dealings with the Authorities*

Richard Humphrey, an attorney who represented Moody in a number of misdemeanors and traffic matters, testified he never made any representations to the court or to the district attorney's office that Moody was a witness in a homicide case and was seeking some leniency or consideration by virtue of that fact. Humphrey did not even know that Moody was a witness in a homicide case when he represented him.

Deputy District Attorney Backers testified she was aware that Moody was in custody for misdemeanor driving on a suspended license. She asked that he be released from custody on his own recognizance because his life was endangered due to the testimony he was going to give in defendant's case. She asked that his misdemeanor traffic case be continued to a later date so

that he could appear as a witness at the preliminary hearing. Backers was also involved in securing Moody's release on his own recognizance in another case. She never asked for any leniency for Moody, and he was convicted in the misdemeanor traffic case.

### B. Second Trial: Special Circumstance Retrial

After the court declared a mistrial at the first trial on the robbery-murder special-circumstance allegation, a second jury was impaneled to retry it.

#### 1. The Prosecution's Case

The prosecution presented a substantially similar but more compact version of its case at the first trial, calling the same major witnesses to establish the facts surrounding the discovery of the victim at the Golden West Bar and the nature of the fatal injuries. Kevin Kelley was called and gave substantially the same testimony. However, Leonard McCurry was not called to testify.

Thomas Moody could not be located, and the prosecution moved to have him declared an unavailable witness. The court held a hearing in which the prosecutor and his inspector presented evidence of their unsuccessful efforts to locate Moody. The court ruled that the prosecution had exercised due diligence in attempting to locate Moody for trial, and that Moody was unavailable. Over defense objection, his prior testimony was read to the jury.

#### 2. Defense Case

Defendant did not testify at the special circumstance retrial.

The defense called the first police officer who arrived at the Golden West Bar and questioned him about the victim's final words and gestures. The defense also called a police officer and an inspector from the district attorney's office who had interviewed Kelley, and questioned them about Kelley's pretrial statements to them. As in the first trial, the defense called Dr. Rogers to testify about the amount of alcohol the victim had ingested.

### C. Second Trial: Penalty Phase

The jury found the robbery-murder special-circumstance allegation to be true, and the trial proceeded to the penalty phase. The prosecutor listed 29 matters in aggravation in his section 190.3 notice, including prior felony convictions and unadjudicated crimes.

## 1. Prosecution Case in Aggravation

### a. Prior Felony Convictions

The prosecutor presented evidence that defendant had suffered five felony convictions from 1976 to 1984: three for second degree burglary, one for attempted first degree burglary, and one for being an inmate in possession of a deadly weapon.

### b. Unadjudicated Criminal Activity

#### (1) Rape of Amanda V. M.; Assault on Patrick Ryan

Amanda V. M. testified that in April 1977, defendant, who lived in the same apartment complex in North Hollywood, approached her in the hallway of the building and forced her into the laundry room by threatening to stab her with a knife. Defendant removed some of her clothing by cutting it away with his knife, and then raped her. Defendant wanted her to come stay at his apartment because he disapproved of her living with a Black man. A week later, defendant threatened to rape her again if she did not leave the Black man's apartment. She told two male friends, who confronted defendant in his apartment. Defendant stabbed one of the men, Patrick Ryan, during the confrontation. The police officer who responded to the disturbance testified that Ryan suffered two stab wounds, one to his hand and one to his groin. After his arrest, defendant told the officer he was trying to defend himself when he stabbed Ryan, and that Ryan had accused him of raping a woman. Defendant was not charged in connection with either the Amanda V. M. or Ryan incidents.

#### (2) Assault on Jose Jacobo

Jose Jacobo testified that in 1976, defendant, part of a group of four or five people, pulled a gun on him and demanded money. Jacobo grabbed the barrel of the gun and pushed it away, and then was hit in the head and beaten with a stick by someone in the group.

#### (3) May Company Theft

A security guard for the May Company department store in North Hollywood testified that, in 1980, defendant struck him a glancing blow when he attempted to prevent defendant and an accomplice from stealing clothing from the store. Defendant acknowledged to his parole officer at the time that he had participated in the theft and swung at the security guard.

(4) *Possession of Weapons While an Inmate*

In 1978, a guard found an inmate-manufactured weapon made out of bedspring material in defendant's cell in Chino State Prison. In 1983, defendant was found with a small handmade knife while incarcerated at the Santa Rita Jail.

c. *Incidents During Custody*

The prosecutor presented evidence of four unadjudicated incidents between 1984 and 1992 that occurred while defendant was incarcerated in the county jail before and during his trials for his capital offense. Defendant threatened to stab an inmate named Mario Holland in the neck with a pair of fingernail clippers. Defendant was involved in a fight with another inmate, George Calderon, and bloodied his nose. After guards responded to a disturbance in which defendant threatened another inmate, Lynch, defendant threatened a guard with a broom.

Finally, the prosecutor presented testimony that defendant had planned to escape. Roger Rosenberg, an inmate incarcerated in the North County Jail in Oakland, testified that on October 25, 1985, he overheard defendant tell another inmate that defendant and his brother were planning defendant's escape from Highland Hospital. The plan involved defendant's brother being armed with a gun. Defendant also mentioned an alternate plan, by which his brother would bring a gun to court and effect his escape.

2. *Defense Case in Mitigation*

a. *Defendant's Testimony*

Defendant testified about his childhood and early adult years. Defendant was born in Portland, Oregon, and his parents settled in the San Fernando Valley area of Southern California when he was 11 or 12 years old. Defendant's parents were both heavy drinkers who frequently fought physically and injured each other. Defendant's father declared he had never wanted to have defendant and his brother Jerry, and he beat them at least once a week. Defendant's father was a neglectful parent who never took defendant anywhere except bars, where he and his brother would play in the parking lot. Although defendant's mother was also a drinker, she provided some degree of care and support to defendant and his brother.

At age nine or 10, defendant felt he did not fit in at school because of his clothes, and because some of the parents told their children not to play with him. He was ridiculed as being "White trash" by the other kids. By this time,

defendant was drinking alcohol, which he stole from a bar. By age 13 or 14, he was drinking heavily. He also sniffed spot remover and smoked marijuana. He was arrested several times for burglary. When he was 14 or 15, he was involved in juvenile court proceedings and was sent to an institution for six months. He attempted suicide around this time. When he was 15 or 16, his mother died. At various times between the ages of 15 and 27 (when he was arrested for the capital crime) defendant was incarcerated at several county jails and state prisons for periods ranging from six months to a year.

On cross-examination, defendant admitted that he possessed books on Satanism, and that, at one point, he had been a member of the Ku Klux Klan. He admitted that when he was 13 years old, he and his brother laid chains on a railroad track, but he denied trying to derail the train. He admitted that, when he was 21 years old, he had broken into a sporting goods store, stolen between 30 and 40 guns, and been sent to state prison for this crime.

### b. *Other Testimony on Defendant's Social History*

The owner of the apartment that defendant lived in when he was around 14 years old testified that defendant's father "just wasn't much of a parent," and that he could smell alcohol in the apartment. A neighbor, Deborah Thielen, testified that every time she saw defendant's father he was intoxicated. Defendant fought with his father, and sometimes ran away for periods of weeks or a month.

Dr. Karen Gudiksen, a psychiatrist, interviewed defendant for approximately 10 hours over five sessions, interviewed defendant's brother for one and a half hours, and reviewed medical, school, and probation records provided by defense counsel. She concluded that defendant suffered from chronic alcoholism with some mild organic brain impairment. His organic brain impairment was probably caused by his excessive consumption of alcohol, his many head injuries, and his use of inhalants, such as sniffing gasoline.

Dr. Gudiksen's social history of defendant paralleled defendant's testimony. Defendant's father was an abusive alcoholic who fought frequently with defendant's mother and beat the children. Defendant's mother was also a drinker. The family was transient, sometimes with no permanent place to stay. Defendant and his brother raised themselves from a very early age, scrounging and shoplifting to obtain clothes. School records indicated that by the fourth grade defendant was working below grade level. A junior high school evaluation stated he was getting little or no help at home, and that he needed a lot of help because he was heading for "real problems" otherwise.

Defendant was drinking and using marijuana by the time he was 12 or 13. He went on to use barbiturates and a wide variety of inhalants. At 16, he was

placed in a juvenile facility for some months, but eventually was returned to his home environment, which remained neglectful and abusive. Around this time, he contemplated suicide after a girlfriend broke up with him. Defendant was not religious as a youth, but as a young adult he converted to Catholicism in custody after taking counseling from a priest.

### c. Expert Witnesses

Dr. Richard L. Basford, a physician whose practice included the treatment of alcoholism, treated defendant for about three years, beginning in 1980. Dr. Basford made a diagnosis of chronic alcoholism and chronic brain syndrome, which is nerve loss in the brain as a result of chronic alcoholism. Basford reexamined defendant in 1992 in the county jail, and diagnosed him with chronic brain syndrome, secondary to multiple head traumas and alcoholism.

Dr. Joseph Izzo, a licensed neurosurgeon, testified that he performed a neurological examination of defendant in 1992 that revealed no evidence of organic brain injury. Defendant's electroencephalogram (EEG) was minimally abnormal and was consistent with, but not diagnostic of, a possible seizure disorder, and provided minimal evidence of a possible left temporal abnormality. A minimal abnormality is one that is not readily evident when the patient is awake.

### d. Character Witnesses

Ronald Paul Harton, the pastor of the Pacifica Baptist Church, allowed defendant to live in his home on two occasions in 1980 when defendant was between incarcerations. The first time was for a few days, the second time for about two months. Harton and his family never had any problems with defendant; according to Harton, defendant tried hard to change his way of life, particularly his alcoholism.

David Ferguson, director of Open Door Mission, a support center for the homeless, knew defendant before his incarceration for the capital crime, when defendant came to his mission for meals. Ferguson found defendant to be "one of the nicest persons you ever want to meet" when he was sober, but an aggressive "idiot" when he was drunk.

Sue Ochs was an attorney appointed by the United States District Court for the Northern District of California to take over a civil lawsuit originally filed by defendant on behalf of himself and two other inmates in the North County Jail concerning the confiscation of religious objects and the lack of religious services for Catholic inmates. The case was ultimately settled, resulting in the

availability of Catholic religious services at the jail. In her interactions with defendant in the course of the lawsuit, she found defendant to be very focused, sincere, and helpful.

Jessie Pettingill corresponded with defendant for seven years as part of her church's prison ministry program. She testified that she and defendant had become very close, and that defendant had helped her through difficult times in her life, such as the death of her granddaughter.

Carol Johnson, a social worker at Catholic Charities in Oakland, served as a visiting chaplain at the North County Jail, where defendant was incarcerated. She had discussions with defendant on various spiritual and secular topics and considered him a very gentle person who was reaching out for help.

Eugene Stelly was a deacon at a Roman Catholic church in Oakland who performed a Catholic religious service at the North County Jail on Sunday mornings. Over a five-year period, he ministered to defendant on a one-on-one basis and found him to be a serious student with whom he had good rapport.

Susan Sawyer, an assistant public defender for Alameda County and defendant's lawyer for his first trial, testified that defendant was polite and hard working. She never felt physically threatened by him, even when alone with him.

### 3. Prosecution Rebuttal

Kathleen Boyovich, a bailiff in the courtroom during part of defendant's first trial in 1988, testified about physical interactions between Defense Counsel Susan Sawyer and defendant. Sawyer fixed defendant's hair, rubbed his head, and put her arms around him. This concerned Boyovich for security reasons, and she personally found it repulsive.

## II. DISCUSSION

### A. First Trial (Guilt Phase)

#### 1. Asserted Prosecutorial Misconduct

Defendant contends that pervasive prosecutorial misconduct denied him a fair trial, a fair special circumstance finding, and a fair death judgment in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution and the corresponding provisions of the California Constitution.[13] The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 [63 Cal.Rptr.3d 433, 163 P.3d 118].) "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*Ibid.*) When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171], quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

As discussed in detail below, we conclude that defendant forfeited several of the instances of asserted misconduct he now raises because trial counsel failed to object or failed to object adequately. We have stated an exception to the requirement that trial counsel must object to each instance of misconduct to preserve it on appeal when the "misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 501–502 [117 Cal.Rptr.2d 45, 40 P.3d 754], citing *People v. Hill* (1998) 17 Cal.4th 800, 821, 836 [72 Cal.Rptr.2d 656, 952 P.2d 673].) But this case did not rise to that level. Defense counsel objected frequently to the prosecutor's conduct, and

---

[13] Regarding this claim and other claims raised on appeal, defendant contends the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised issues at trial, however, he failed explicitly to make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by defendant to preserve them, or involved application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional legal consequence of violating the federal Constitution. To that extent, defendant has not forfeited his new constitutional claims on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084, fn. 4 [40 Cal.Rptr.3d 118, 129 P.3d 321].) On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or " 'gloss' " raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

the trial court sustained several objections. From our review of the record, we conclude the trial court kept a firm hand on the actions of the attorneys and maintained a fair proceeding.

■ For all the asserted instances of misconduct, whether forfeited or not, we conclude either that the instance was not misconduct or that any misconduct that occurred could not have contributed to the verdict and was harmless in light of the evidence of defendant's guilt. (See *People v. Hardy* (1992) 2 Cal.4th 86, 173 [5 Cal.Rptr.2d 796, 825 P.2d 781].) In concluding that any misconduct that occurred was not prejudicial we again note that the trial court was firmly in charge of the proceeding and kept matters under control by sustaining several defense objections. Furthermore we conclude that none of the asserted instances of misconduct was of such severity, considered alone or together with the other asserted instances of misconduct, that it resulted in an unfair trial in violation of defendant's state and federal constitutional rights. (See *ibid.*)

### a. Disparagement of Defense Counsel

During trial, the prosecutor, Theodore Landswick, described Defense Counsel Susan Sawyer as being "a true believer" who would "support her belief based only on her belief," and likened her arguments to "spit[ting] in your face to insult you." He repeatedly accused her of obscuring the truth and confusing the jury. Defendant also contends the prosecutor implied that trial counsel had stopped playing a taped statement in order to cover something up, even though the court had made a ruling outside the presence of the jury that she could not play the rest of the tape.

Defense counsel frequently objected during the prosecutor's closing argument and rebuttal, but mainly on the basis that he was misstating the evidence. Defense counsel only specifically objected to three comments as personal attacks: (1) the "true believer" comment, which was sustained and the prosecutor was instructed to "leave personalities out of it," (2) the comment that one of her arguments was "childish," which was overruled, and (3) the tape-stopping coverup implication, which was sustained to the extent the court instructed the prosecutor, for the second time, to refrain from making personal attacks. Accordingly, defendant's claims as to the other comments are forfeited. (*People v. Alfaro, supra,* 41 Cal.4th at p. 1328.)

■ While we have stated " '[a] prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom,' " we have also observed that "[p]ersonal attacks on opposing counsel are improper and irrelevant to the issues." (*People v. Sandoval* (1992) 4 Cal.4th 155, 184, 183–184 [14 Cal.Rptr.2d 342, 841 P.2d 862].) As to the prosecutor's comments in closing argument about defense counsel's playing the tape, we

conclude that there was no misconduct. "The prosecutor did not engage in such forbidden tactics as accusing defense counsel of fabricating a defense or factually deceiving the jury." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) The complete transcript of the tape had already been presented to the jury by that point in the trial, so the prosecutor was not insinuating that trial counsel was trying to hide anything. Rather, the focus of the prosecutor's comments was that trial counsel's playing only a part of the tape could have left a misleading impression on the jury, which the prosecutor sought to correct by referring to the complete transcript during his closing argument.

As to the other personal comments, both forfeited and unforfeited, even assuming the prosecutor's behavior was misconduct, we conclude that defendant was not prejudiced. The trial court twice firmly admonished the prosecutor against making personal comments, which insured that the jury understood that such comments were irrelevant to its consideration of the case.[14] From our review of the record, we conclude " 'it is not reasonably probable that the prosecutor's occasional intemperate behavior affected the jury's evaluation of the evidence or the rendering of its verdict.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 503 [15 Cal.Rptr.3d 656, 93 P.3d 271], quoting *People v. Espinoza* (1992) 3 Cal.4th 806, 820–821 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

### b. *Disparagement of Defendant*

Defendant contends the prosecutor committed misconduct by laughing during defendant's testimony on direct examination, and by making disparaging comments about defendant during summation.

### (1) *Laughing*

During a break in the proceedings, defense counsel objected to the prosecutor's conduct during defendant's testimony, asserting he had "been kind of sitting there laughing." The court overruled the objection, noting that it was "not going to tell people they can't laugh or smile." Later, during her closing argument, defense counsel stated, "[d]uring Mr. Friend's testimony on

---

[14] After sustaining defense counsel's objection to the "true believer" comment, the court said: "[Y]ou're complaining that she is a true believer. Make your comments. You can argue about what was good or what was bad in your opinion about her argument, but I think personally you should leave personalities out of it." Later after defense counsel objected to the asserted implication that she had stopped playing a tape at a key point to cover up what came next, the court stated: "First of all, Mr. Landswick, I'm going to ask you again to refrain from personal attacks upon defense counsel . . . ."

the stand, Mr. Landswick was laughing, rolling his eyes, waving his hands, did a lot of things to give the impression that this testimony was absolutely not worthy of belief." During his rebuttal argument, the prosecutor referred to his "chortling during the examination of the defendant," explaining that "what caused [him] to chuckle" was that defense counsel engaged in leading questions to get the testimony she wanted from defendant.

■ We have stated that "juvenile courtroom behavior by a public prosecutor demeans the office . . . ." (*People v. Hill, supra,* 17 Cal.4th at p. 834.) Here, how much the prosecutor laughed is unclear, although the prosecutor himself admitted to some chuckling and chortling. Even assuming the prosecutor's behavior was misconduct, we conclude it was harmless. The trial court, which was in the best position to assess the prosecutor's behavior, did not find that his actions disrupted the proceedings. Defendant further argues that the laughter provoked defendant to be hostile to the prosecutor during his cross-examination, which redounded to defendant's detriment in front of the jury. The record, however, indicates that defendant's hostility during cross-examination was caused by the prosecutor's rigorous questioning. Any additional hostility accruing from the laughter appears minimal. Given this record, we see no prejudice to defendant.

### (2) *Disparaging Comments*

■ Defendant complains of various disparaging comments made by the prosecutor, none of which were objected to at trial, and all of which are therefore forfeited on appeal. Furthermore, we reject defendant's claim on the merits. The prosecutor commented on the fact that defendant had "washed his hands in the toilet bowl" and described defendant's living beneath the sidewalk as "living like a mole or the rat that he is." As we have noted, the use of derogatory epithets to describe a defendant is not necessarily misconduct. (*People v. Ashmus* (1991) 54 Cal.3d 932, 975 [2 Cal.Rptr.2d 112, 820 P.2d 214], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) The prosecutor's remarks here were founded on evidence in the record and fell within the permissible bounds of argument. (See *People v. Zambrano, supra,* 41 Cal.4th at p. 1172 [argument may include opprobrious epithets warranted by the evidence]; *People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710] [prosecutors are afforded a wide range of descriptive comment, including epithets].) Defendant also complains that the prosecutor implied or directly stated that defendant had lied in his testimony at various points. But, "[w]hen a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1173.) Such was the case here.

### c. Elicitation of Evidence on Subject Matters That Had Been Ruled Inadmissible

Defendant contends the prosecutor repeatedly elicited prejudicial evidence that previously had been ruled inadmissible.

#### (1) Dina Mladinich's Hearsay Statement

After the murder, Dina Mladinich, the owner of the warehouse, told Moody that defendant had blood on his pants. This caused Moody to engage defendant in a conversation that revealed defendant had discarded the knife used in the murder. In preparation for Moody's testimony, defense counsel moved to have the prosecutor instruct Moody not to testify as to what Mladinich said, on the grounds it was hearsay. The court instructed the prosecutor that while Moody could testify that a conversation with Mladinich had led him to believe there had been some trouble concerning defendant, which in turn caused him to ask defendant about blood on his clothing, Moody was not to mention what Mladinich had told him. Despite the court's instruction, on redirect examination the prosecutor began to ask Moody a question on precisely this point. Defense counsel cut off the prosecutor with an objection before Mladinich's comment could be revealed to the jury. The court admonished the jury to disregard the prosecutor's question. Defense counsel asked the court to cite the prosecutor for misconduct and later, outside the presence of the jury, moved for a mistrial. The court denied the motion, but severely chastised the prosecutor and warned him against any further misconduct. Later, during closing argument, the prosecutor made a passing reference to the hearsay statement ("Moody had talked to Dina about blood on Friend's pants") which was not objected to.

In directly posing a question about Mladinich's statement, the prosecutor violated the trial court's prior evidentiary ruling, and, whether done intentionally or not, committed misconduct. (See *People v. Hill, supra,* 17 Cal.4th at pp. 822, 829 [prosecutorial misconduct does not require a showing of bad faith].) We conclude, however, that the misconduct was harmless. Defense counsel cut off the prosecutor with an objection before the hearsay statement could be revealed to the jury, and the trial court admonished the jury to disregard the question. As to the prosecutor's reference to the hearsay statement during summation, defendant forfeited this claim by failing to object. Moreover, on the merits, we conclude the comment was harmless because it was brief and ambiguous as to who had mentioned the blood, Moody or Mladinich. Defendant contends that any reference to the Mladinich hearsay statement about blood on defendant's clothing was particularly damaging because this was the only independent corroboration of Kelley's account of the evening. Defendant had admitted, however, both in his

recorded statement to the police and in his testimony, that there was blood on his clothing that evening. On this record, we see no prejudice to defendant.

### (2) *Prior Trouble at the Oasis*

During his opening statement, the prosecutor described how defendant, Hollowhornbear, and Kelley ended up going to the Golden West Bar the night of the murder. Originally, the group was headed to buy beer at the Oasis, a convenience store in downtown Oakland. But, because defendant had been in trouble at the Oasis before, he did not want to go there that night, so they went to the Golden West Bar instead. The trial court sustained a defense objection to the prosecutor's comment during opening statement that defendant had been in trouble at the Oasis, and instructed the jury to ignore it. Later, in preparation for Kelley's testimony, defense counsel made an in limine motion to preclude Kelley from mentioning that the reason defendant did not go the Oasis was because he had stolen something or gotten into trouble there before. The court ruled that the fact defendant stole something there was to be excluded because it was a crime, but also ruled that generally mentioning that defendant had gotten into trouble there would be allowed. During Kelley's testimony, over the objection of defense counsel, the prosecutor elicited testimony that defendant had said he did not want to go the Oasis because "he had trouble there in the past."

Defendant contends that the prosecutor engaged in misconduct by mentioning the Oasis incident during his opening statement and later asking Kelley a question about it. We conclude there was no misconduct. Before the prosecutor's opening statement, the trial court had not ruled that any and all mention of defendant's past troubles at the Oasis was excluded. When the trial court did rule on the issue, immediately before Kelley's testimony, it excluded inquiry into prior stealing, but allowed inquiry into the general fact that defendant had gotten into trouble there before, which was what the prosecutor's question raised.[15]

### (3) *Defendant's Prior Jail Time*

In preparation for Kelley's testimony, defense counsel made an in limine motion to exclude any inquiry into the fact that defendant had previously been incarcerated. The court ruled that, in his direct testimony, Kelley should avoid any reference to defendant's having been jailed, but noted that, if the defense raised the issue on cross-examination, the door would be open to the subject. Later, while cross-examining defendant, the prosecutor asked defendant whether, prior to the murder, he had been released from jail. During a

---

[15] Defendant does not challenge the trial court's ruling allowing this inquiry.

break, outside the presence of the jury, defense counsel objected that the prosecutor had raised defendant's prior jail time. The court ruled that its prior ruling had only applied to other witnesses, and that, once defendant took the stand, he opened up the issue, especially in light of the fact that on direct examination defendant had testified he had suffered two prior felony convictions.

Defendant acknowledges the court ultimately overruled the defense objection to the prosecutor's question, but argues that the prosecutor nonetheless engaged in misconduct because the information was inadmissible at the time the prosecutor posed the question. But the trial court's earlier ruling had not categorically prohibited the subject. Because the defense opened the door to the subject by eliciting defendant's prior felony convictions in his direct testimony, the prosecutor properly could raise the issue in cross-examination.

### d. *Misconduct During Closing Argument: Vouching for Kelley's Testimony*

Defendant contends that the prosecutor engaged in improper tactics during closing argument. Defendant's main contention is that the prosecutor used stricken evidence and engaged in improper vouching for Kelley's testimony about how far down 12th Street he was when he saw defendant emerge from the bar.

### (1) *Background*

As recounted above, Kelley testified he was about three-quarters of the way down the block of 12th Street (between Webster and Harrison Streets) when he stopped to look back and saw defendant and Hollowhornbear on the sidewalk in front of the Golden West Bar. During cross-examination, defense counsel asked Kelley why, at every previous instance in which he had given a statement or testified, he had stated that he had passed Harrison Street before looking back. Kelley answered, "I retraced my, you know, steps and I just went to the same spot I thought I did that night," and reasserted that he had not crossed Harrison Street before looking back.

During the prosecutor's case in rebuttal, he called Michael Pon, an inspector for the district attorney's office, who testified that, on November 15, 1988, he, Prosecutor Landswick, and Kelley returned to the area of the Golden West Bar, so that Kelley could retrace his steps on the night of the murder.[16] Pon testified that Kelley crossed the intersection of Webster and

---

[16] Defendant's first trial ran from August 1, 1988, through February 17, 1989. Kelley's direct testimony was on December 1, 1988. Pon's testimony was on December 14, 1988.

12th Street, walked east down 12th Street, and then stopped three-quarters of the way down the block at a light pole in front of the Cochran and Celli automotive dealership. There were four light poles on the block equally spaced apart and Kelley stopped at the third one. The distance between the light pole and the front door of the auto dealership was approximately 38 feet. The distance between the light pole and corner of 12th and Harrison (the next intersection down) was approximately 112 feet.

Defense counsel successfully moved to strike Pon's testimony on the grounds that Kelley's step-retracing demonstration constituted hearsay. The prosecutor then asked that Pon's testimony about the measurements from the door of the auto dealership to the light pole and from the door to the corner be allowed to remain as evidence. Defense counsel had no objection, and the court so ruled.

During his summation, the prosecutor discussed how far down 12th Street Kelley was on the night of the murder when he looked back and saw defendant. The prosecutor stated that Kelley "testified at this trial that he went back on November 15th of 1988 and he walked the scene again for the first time, and he said he got to approximately the light, the streetlight after the front doors of Cochran and Celli."[17] The prosecutor also returned to the issue in his rebuttal summation. He acknowledged that Kelley had, in his previous statements and testimony, indicated he was farther down 12th Street when he saw defendant coming out of the bar. The prosecutor stated that Kelley's latest account was "after we went with him for a walk to recreate the scene and he testified that he did not cross Harrison, that he stopped beyond the doors of Cochran and Celli, which is in the middle of the block." Then, apparently referring to a diagram, the prosecutor presented a series of measurements concerning the distances to various points on 12th Street, at one point referring to the Pythagorean theorem to compute one of the distances.[18] In support of his numbers, he stated, "I measured the distance where Kevin Kelley said he was now was [sic] as 124 yards or 371 feet, 124 yards." He also stated that he had measured the distance to the corner of 12th and Harrison as 616 feet (approximately 200 yards), and that defense counsel had been incorrect in her summation in stating the distance as 559 feet. Holding up a golf ball, he used a golf analogy to dispute the defense argument that Kelley could not have seen defendant because he was too far down the street. He stated that 124 yards (the distance to the light pole in front of the auto dealership) or even 200 yards (the approximate distance to

---

[17] During this part of his summation, the prosecutor was referring to People's exhibit No. 9, which was a diagram of the streets in the area of the Golden West Bar.

[18] The prosecutor referred to one of the two measurements by Pon that was allowed into evidence, but he did not expressly identify the evidentiary basis for all the measurements he presented at trial.

the corner of 12th Street and Harrison) were distances from which golfers can see from the tee a one-inch golf flag at the hole.

### (2) *Analysis*

Defendant contends the prosecutor relied on the stricken Pon testimony to misrepresent Kelley's testimony, and that he also improperly vouched for Kelley's testimony. We conclude that, in his description of Kelley's testimony, the prosecutor added details from the stricken Pon testimony and at least one detail from the prosecutor's own recollection as well. Kelley's only reference to the reenactment was: "I retraced my, you know, steps and I just went to the same spot I thought I did that night." The prosecutor added the details (1) that Kelley had gone to the scene with him and Pon, (2) that it was the first time Kelley had been back there, and (3) that Kelley stopped in front of a lamp pole in front of the doors of the Cochran and Celli auto dealership.[19]

Defense counsel never objected to the prosecutor's comments about the reenactment during closing argument. Respondent, however, acknowledges that defense counsel had made several unsuccessful objections to other statements made by the prosecutor in closing argument on the grounds that he was misstating the evidence, and respondent concedes defendant's point that any further objection as to these specific statements involving the reenactment would have been futile, as the court repeatedly had stated it was to going to adhere to its ruling that the jury had heard the evidence and could make up its own mind about the accuracy of the prosecutor's statements.

Assuming the claim was preserved for review, we conclude defendant suffered no prejudice from the prosecutor's comments. As to the first added detail, there was no dispute that the prosecutor and Pon were present at the reenactment, even though Kelley did not describe their presence in his brief reference to the reenactment during his testimony. This detail was not prejudicial to defendant. If anything, the fact the prosecutor was at the reenactment was consistent with the defense argument that the prosecution coached its witnesses.

The second detail (that it was Kelley's first return to the scene) was implicit in Kelley's answer in cross-examination about why his testimony at defendant's trial was now different from his statements on previous occasions about his location, namely that something new had happened since the last time he testified (he had retraced his steps). But even if this detail added new information, any effect on the credibility of Kelley's testimony was minimal.

---

[19] The detail that it was the first time Kelley had been back appears to be the prosecutor's recollection, since it was not in Kelley's or Pon's testimony.

As to the third detail about Kelley's stopping in front of the doors of the dealership by the lamp pole, Kelley had stated in his testimony that he had walked "three-quarters of the way down" 12th Street, "where that car dealer is." Defense investigator Dea had testified that there were four street lights on each side of the blocks of 12th Street between Franklin and Harrison, which includes the block between Webster and Harrison. Thus, the prosecutor could permissibly draw the inference that Kelley had stopped at the third lamp pole on the block between Webster and Harrison based on Kelley's testimony and that of the defense investigator, even though Pon's testimony had been stricken. As noted, the 38-foot distance from this lamp pole to the door of the auto dealership was allowed to remain in evidence.

■ The prosecutor's use of the golf analogy in his rebuttal was permissible.[20] As we have held, prosecutors are entitled " ' "during summation [to] state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." ' " (*People v. Williams, supra,* 16 Cal.4th at p. 221.) Furthermore, we see no prejudice from the distance arguments presented by the prosecutor. Defense investigator La Beaux had testified to a series of measurements she had taken using a roller tape from the Golden West Bar to several points down 12th Street. Both the prosecution and defense presented numerous maps and diagrams of the 12th Street area in the course of the trial. Thus, there remained a body of evidence from which the prosecutor could have drawn reasonable inferences about the distances involved, even though most of Pon's testimony in this area had been stricken. While the exact evidentiary source for every measurement the prosecutor used in his summation is unclear, defendant does not contest the accuracy of any of the measurements.

Finally defendant contends that the prosecutor's statements about the distances, together with his assertions that he had personally measured them, had the effect of vouching for Kelley's testimony about what he had seen on the night of the murder. Admittedly, the prosecutor displayed poor judgment in inserting himself into his closing argument. But, when viewed in context, his statements about personally measuring the distances in effect expressed the permissible argument that he had presented to the jury accurate computations about the distances. He did not make the impermissible argument that, because he had personally visited the scene and measured the distances, Kelley's testimony must be true.

---

[20] It should be noted that, in her summation, defense counsel had used a sports analogy, which appears to have inspired the prosecutor's use of one in rebuttal. In focusing on Kelley's previous statement that he had been at the corner of 12th and Harrison, defense counsel described the distance as 559 feet, which she analogized to the length of two football fields.

### e. *Misconduct During Closing Argument: Misrepresentation of Moody's Testimony*

During cross-examination of Moody, defense counsel introduced evidence of Moody's numerous criminal violations for driving without a license and several charges of domestic violence and battery. For one series of charges for unauthorized entry and battery, which were pending in 1988, Moody explained that he was inside his own dwelling when someone jumped him from behind. In summation, the prosecutor alluded to this testimony, stating that Moody's former girlfriend, Lola Power, and her father had attacked him in the house where he lived with Lola. Defense counsel objected that there was no such evidence in the record. The court overruled the objection, noting that when the issue came up of his assaulting or battering his wife, Moody tried to explain away his conduct, and defense counsel had asserted in her closing argument that at the time Moody was taken into custody in 1984 he had a case pending for domestic battery. Defense counsel stated that the pending case she referred to was for battery against his wife, not against his girlfriend, Lola Powers, an incident that happened later. The court replied that it was unclear as to whom Moody had been referring, and that the jury would have to sort it out.

We see no misconduct. It appears that the prosecutor was correct that the battery charge pending in 1988, which Moody attempted to explain away, related to the Lola Powers incident. In overruling the objection, it appears the trial court became confused as to which incident defense counsel had referred to in her summation (which was actually the domestic battery charge pending in 1984). But we see no prejudice to defendant. As the trial court noted, the jury had heard all the evidence, and could draw the appropriate inferences from the arguments of counsel.

### f. *Other Asserted Misconduct*

In addition to the asserted misconduct discussed above, defendant cites numerous other instances of asserted misconduct based on the prosecutor's asking leading questions, misstating the evidence, and misstating the law. Defendant failed to object to many of the asserted leading questions he cites on appeal, thus forfeiting the claims. The trial court sustained defendant's objections to some leading questions, thus obviating any prejudice. Regarding any asserted leading question cited on appeal to which the trial court overruled an objection, we see no abuse of discretion in the court's rulings and no prejudice to defendant. We likewise see no prejudice from any of the leading question claims cited on appeal that were forfeited for failure to object.

As to the prosecutor's asserted misstatements, defendant contends the prosecutor improperly read passages of Kelley's prior testimony to the jury under the guise of refreshing Kelley's recollection. But our review of the record indicates that the prosecutor followed the proper procedure for refreshing recollection by having Kelley first review the material silently and then asking him whether that had refreshed his recollection. (See *People v. Parks* (1971) 4 Cal.3d 955, 960–961 [95 Cal.Rptr. 193, 485 P.2d 257].) There was no misconduct.

Finally, defendant contends the prosecutor misstated the law in two instances during closing argument. In the first instance, the prosecutor appeared to make the improper argument that defendant's prior felony convictions could be used to support his motive for the robbery murder. But there was no prejudice to defendant, because the court sustained a timely defense objection and admonished the jury that defendant's prior felony convictions were admitted, and were to be considered, solely for the purpose of impeaching his credibility.

In the second instance, defendant contends the prosecutor improperly argued that the mental state for robbery was the same as that for premeditated murder. Trial counsel did not object to the prosecutor's argument and the claim is forfeited on appeal. It also fails on the merits. The prosecutor described defendant's intentional act of opening the knife within the context of defendant's plan to both commit a robbery and to eliminate the bartender as a witness by killing him. The prosecutor focused on defendant's intent to use the knife in relation to the evidence of the nearly decapitated state of the victim in order to argue the inference that defendant had planned to use the knife not just to rob, but also to kill the victim.

### 2. *Asserted Unreliability of the Testimony of Kevin Kelley*

Defendant contends the testimony of Kevin Kelley was inherently unreliable and therefore constitutionally insufficient to support defendant's conviction, special circumstance finding, and death sentence. Instead of presenting a traditional sufficiency of the evidence claim, however, defendant contends that the trial court should have excluded Kelley's testimony as being inherently improbable.[21] (See *People v. Mayfield* (1997) 14 Cal.4th 668, 735 [60

---

[21] Although couched as an insufficiency of the evidence claim, defendant focuses exclusively on Kelley's testimony, which was the main, but not the exclusive, basis of the prosecutor's case. As noted above, defendant's recorded statement and his own testimony also placed him as one of the last two people to see the victim before the robbery, and prosecution witnesses Moody and McCurry also testified that defendant admitted he committed the murder. Defendant makes separate claims, discussed below, that Moody and McCurry were also inherently unreliable.

Cal.Rptr.2d 1, 928 P.2d 485] [rejecting claim].)[22] Defendant repeats at length the defense impeachment arguments made at trial that Kelley's testimony was unreliable because it differed in some details from Kelley's previous statements and prior testimony at other proceedings, and because Kelley received food and lodging money as a protected prosecution witness.

█ The impeachment arguments that defendant repeats against Kelley involve simple conflicts in the evidence that were for the jury to resolve. (See *People v. Mayfield, supra,* 14 Cal.4th at p. 736.) Of course, "it is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones* (1990) 51 Cal.3d 294, 314–315 [270 Cal.Rptr. 611, 792 P.2d 643].) To the extent defendant also argues that Kelley's testimony was inherently incredible, we reject that claim too. " ' "To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 306 [228 Cal. Rptr 228, 721 P.2d 110].) Defendant fails to make such a showing.

### 3. *Other Asserted Errors Related to Kelley's Testimony*

#### a. *Instructional Errors*

##### (1) *CALJIC No. 2.13*

█ Defendant contends that the court erred in instructing pursuant to CALJIC No. 2.13 on prior consistent or inconsistent statements as evidence.[23] He complains that only telling the jurors that they could consider prior inconsistent statements for their "truth," but not telling them they could also consider them for their "falsity," unfairly skewed the jury's credibility determinations in the prosecutor's favor. However, we have previously rejected such claims by noting that "the instruction in no way directs the jury to accept prior statements as the truth; it merely covers the hearsay exceptions provided in Evidence Code sections 1235 and 1236, in a neutral fashion." (*People v. Harris* (2008) 43 Cal.4th 1269, 1293 [78 Cal.Rptr.3d 295,

---

[22] Defendant notes that defense counsel unsuccessfully made a pretrial motion to exclude the testimony of both Kelley and Moody as being "inherently unreliable." After hearings at which Kelley and Moody and the police officers who initially arrested them testified, the court denied the motion, stating that the testimony of Kelley and Moody was relevant and material, that they were competent to testify, and that the question of their credibility or reliability was for the jury.

[23] "Evidence that on some former occasion, a witness made a statement or statements that were inconsistent or consistent with his testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion."

185 P.3d 727], citing *People v. Wilson* (2008) 43 Cal.4th 1, 20–21 [73 Cal.Rptr.3d 620, 178 P.3d 1113].)[24]

### (2) *CALJIC No. 3.11*

Defendant contends the trial court erred at both the guilt and special circumstance trials by instructing the jury with an inadequate version of CALJIC No. 3.11. At the time the court gave the instruction at defendant's guilt phase trial in 1988, CALJIC No. 3.11 read: "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence that tends to connect such defendant with the commission of the offense." (*Ibid.* (5th ed. 1988).) In *People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285], we held that the corroboration requirement applied to *both* the *in-court testimony* and the *out-of-court statements* of accomplices. The 1990 revision of CALJIC No. 3.11 (1990 rev.) (5th ed. 1988) added the following optional paragraph: "Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated was true."

■ Defendant contends the trial court erred in failing to give the second optional paragraph at both defendant's guilt trial and his special circumstance retrial. As to the defendant's guilt trial, defendant concedes that CALJIC No. 3.11 was not amended until after that trial. As to defendant's special circumstance retrial, this trial did occur after the 1990 revision to CALJIC No. 3.11. However, we have held that a trial court has no sua sponte duty to modify the instructions on accomplice corroboration to indicate that they apply both to in-court and out-of-court statements. (*People v. Lawley* (2002) 27 Cal.4th 102, 160–161 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Andrews, supra,* 49 Cal.3d at pp. 214–215.) Defendant was required to request the additional paragraph, which he did not do. (*People v. Lawley, supra,* 27 Cal.4th at p. 160.)

Moreover, even if we assume the trial court erred in not including the optional clarifying paragraph, such error was harmless. Kelley's credibility was a central issue in both of defendant's trials. Defense counsel exhaustively raised the inconsistencies between Kelley's in-court testimony and out-of-court statements. Under these circumstances, the jury was already well aware that it was required to scrutinize all of Kelley's statements, including especially his out-of-court statements. It is therefore not reasonably probable

---

[24] Defendant also contends the admission of the prior statements themselves violated the confrontation clause. But, as defendant acknowledges, there is no confrontation clause problem when the witness was available, as was Kelley, for cross-examination. (See *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

that the jury would have reached a result more favorable to defendant if they had been instructed with the additional instruction defendant urges. (*People v. Lawley, supra,* 27 Cal.4th at p. 161, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### b. *Improper Bolstering of Kelley's Testimony by Other Prosecution Witnesses*

Defendant contends the prosecution improperly bolstered the testimony of Kevin Kelley by calling three witnesses who had been members of the district attorney's office at the time of Kelley's arrest in connection with the Golden West murder: then Alameda County Superior Court Judge Joanne Parrilli, Deputy District Attorney Jerry Curtis, and Deputy District Attorney Angela Backers. As recounted above, Parrilli, Curtis, and Backers all testified that the district attorney's office viewed Kelley as a witness rather than a participant in the robbery murder at the Golden West Bar, and that the office never made any promises of immunity to Kelley. As recounted above, the prosecution called these witnesses in its rebuttal case in response to the defense argument that the district attorney's office promised Kelley immunity from prosecution in exchange for his testimony. Defendant acknowledges that the prosecutor was entitled to present evidence that Kelley was not offered immunity from prosecution, but argues that the testimony went beyond that to become irrelevant and improper vouching for Kelley's version of events at the Golden West. We disagree. Defense counsel's argument was not only that Kelley had been offered immunity but also that the prosecutor could have prosecuted Kelley as an accomplice but agreed not to do so in exchange for his testimony. The testimony of Parrilli, Curtis, and Backers included the district attorney's office's assessment of Kelley's involvement in the crime, which was that he was a witness, not a participant. The challenged testimony therefore was relevant to rebutting the defense argument that the prosecution had leverage over Kelley because it could have prosecuted him as an accessory in the robbery murder.

### 4. *Asserted Unreliability of the Testimony of Thomas Moody and Leonard McCurry*

Defendant contends that the testimony of Thomas Moody and Leonard McCurry was constitutionally insufficient to support defendant's conviction, special circumstance finding, and death sentence. Defendant questions Moody's motives and renews the arguments he made at trial that Moody testified falsely in exchange for the food and lodging benefits he received as a protected witness, and also in exchange for the prosecutor's lenient treatment of various criminal charges (unrelated to the capital crime) pending against him. As for McCurry, defendant renews his argument that McCurry testified

falsely in exchange for the prosecution's arranging to have him serve out the remainder of his sentence in a prison closer to his family.

The jury heard all this evidence bearing on the credibility of Moody and McCurry, and, apparently, still chose to believe them. As we have noted, "it is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones, supra,* 51 Cal.3d at pp. 314–315.) " ' "To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Barnes, supra,* 42 Cal.3d at p. 306.) Defendant fails to make such a showing.

### 5. *Asserted* Carter *Error*

Defendant contends the trial court committed error under *People v. Carter* (1957) 48 Cal.2d 737 [312 P.2d 665] when it allowed the prosecutor to present, over objection, the testimony of Moody's attorney, Richard Humphrey, in rebuttal. As recounted, *ante* at page 22, Attorney Humphrey testified he did not know Moody was a witness in a homicide case when he represented Moody on various misdemeanor and traffic charges, much less had he made any representations to the court or the prosecutor for leniency based on that fact.

In *People v. Carter, supra,* 48 Cal.2d 737, we disapproved of the prosecutorial tactic of intentionally withholding crucial evidence properly belonging in the case-in-chief to take unfair advantage of the defendant. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1211 [249 Cal.Rptr. 71, 756 P.2d 795].) But *Carter* is inapplicable here. We have applied *Carter* only to " 'crucial' " or " 'material' " evidence that properly belonged only in the case-in-chief. (*Bunyard,* at p. 1212.) Here, the testimony of attorney Humphrey was not evidence that by itself established guilt or was directly probative of the crimes charged. (*Ibid.*) Rather, it was collateral evidence bearing on Moody's credibility.

Defendant also contends that Humphrey's testimony should have been excluded on the grounds of relevance. Defendant never objected on this ground below, and the claim is therefore forfeited. Moreover, the claim is meritless. Humphrey's testimony was relevant to the defense argument that Moody had lied in his testimony in exchange for leniency by the prosecutor. The fact that Moody's attorney was unaware of Moody's status as a witness and never made any appeals for leniency based thereon was relevant to that issue.

### 6. *Asserted Ineffective Assistance of Counsel Based on Conflict of Interest*

Defendant contends that he was denied his right to the effective assistance of counsel based on a conflict of interest because his counsel, the Alameda County Public Defender's Office, had previously represented prosecution witness Moody, and the fact of this previous representation precluded trial counsel from impeaching Moody concerning the prior arrest in which the office represented him. We conclude that, even if a conflict of interest existed, defendant was not prejudiced because defense counsel was able to impeach Moody with numerous other similar criminal convictions.

### a. *Background*

During pretrial motions in the first trial, defense counsel informed the court that the public defender's office had represented Moody in a hit-and-run case. A warrant was still outstanding for Moody for this incident when he was taken into custody by the police and gave statements about defendant's involvement in the capital crime. Defense counsel stated she had not reviewed the public defender's file on the case, but she looked at the court file, which indicated that Moody received three years' probation and was ordered to pay restitution, which defense counsel considered a standard disposition in a hit-and-run case. She stated she would not argue that Moody's sentence in the hit-and-run case was related to his being a prosecution witness. But she proposed that she be allowed to cross-examine Moody about the facts of the case and particularly about the fact that, although there was a warrant out for his arrest at the time he was taken into custody, he was released after he gave a statement to the police incriminating defendant. The prosecutor opposed this and indicated that if the court allowed her to proceed that way, the prosecutor would let the jury know that defense counsel was attacking a witness concerning a case in which her office had represented him.

The trial court ruled that no reference to the hit-and-run case should be made by either defense counsel or the prosecutor. The trial court was concerned that allowing defense counsel to examine Moody about the case would be impermissible as a conflict of interest. The court engaged in a balancing test under Evidence Code section 352 and determined it would be prejudicial to the public defender's office to appear to be in a conflict of interest, and that, by extension, it would be prejudicial to defendant if defense counsel were seen as doing so. The court noted that defense counsel was proposing to impeach Moody with 16 other criminal cases, and that there was

another warrant out for Moody's arrest for another crime when he was taken into custody, which defense counsel could raise.[25]

### b. *Analysis*

■ " 'The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 673 [27 Cal.Rptr.3d 360, 110 P.3d 289], quoting *People v. Cox* (2003) 30 Cal.4th 916, 948 [135 Cal.Rptr.2d 272, 70 P.3d 277], both disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) We agree defendant has shown " 'an actual conflict of interest' " here, that is, "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." (*Mickens v. Taylor* (2002) 535 U.S. 162, 171 [152 L.Ed.2d 291, 122 S.Ct. 1237], italics omitted.) Because of the conflict of interest created by the public defender's office's representation of Moody in the hit-and-run case, defense counsel was precluded from impeaching Moody with that case. Defendant contends that because of defense counsel's actual conflict of interest, prejudice must be presumed. We disagree. In *People v. Rundle* (2008) 43 Cal.4th 76, 168–176 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22, we considered whether a showing of an actual conflict of interest necessarily results in a presumption of prejudice, and concluded that it does not. (*Rundle,* at p. 173.) Rather, "[o]nly when the court concludes that the possibility of prejudice and the corresponding difficulty in demonstrating such prejudice are sufficiently great compared to other more customary assessments of the detrimental effects of deficient performance by defense counsel, must the presumption be applied in order to safeguard the defendant's fundamental right to the effective assistance of counsel under the Sixth Amendment." (*Ibid.*) Here there was no possibility of great prejudice arising from the conflict nor was there any difficulty in assessing its detrimental effect. Its effect was limited to defense counsel's being precluded from using one additional criminal case to impeach Moody. Because the presumption of prejudice is inapplicable here, we apply the usual second prong of the test for deficient performance of counsel, namely, whether there was " ' "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Id.* at pp. 169–170, quoting *Mickens v. Taylor, supra,* at p. 166, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].) We conclude there was

---

[25] After defendant's first trial, and prior to his second trial (the special circumstance retrial) the Alameda County Public Defender's Office filed a declaration that a conflict existed for them, and private counsel were appointed for his second trial.

no reasonable probability of a different result if defense counsel had impeached Moody about the one additional case. Defense counsel was not precluded from impeaching, and in fact did proceed to impeach, Moody with his numerous other criminal violations and with the fact that when he was questioned and later released by the police there was a warrant out for his arrest in another case.

### 7. Asserted Trial Court Error in Denying Defendant's Request for a Jury Visit to the Area of the Crime

Defendant contends the trial court erred in denying the defense request for a jury visit to the area surrounding the Golden West Bar. Defense counsel proposed that the jury go to 12th Street to view what they could see from the various positions Kelley described in his testimony. In considering the request, the trial court discussed the difficulties of recreating the exact conditions under which Kelley made his observations four years previously, and noted that street lighting may have changed significantly in the intervening time. In response, defense counsel proposed that the visit could occur in the daytime, arguing that the main issue for the defense was distance, not lighting. The trial court denied the request.

Section 1119 provides: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, . . . it may order the jury to be conducted in a body . . . to the place . . . ." "A court's ruling on a party's motion for a jury view is reviewed for abuse of discretion," that is, "whether the court exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Lawley*, *supra*, 27 Cal.4th at p. 158.) " 'When the purpose of the view is to test the veracity of a witness's testimony about [his or her] observations . . . , the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view.' " (*Ibid.*)

The trial court did not abuse its discretion in denying the request. While practical difficulties did not particularly militate against the request (the area in question being close to the courthouse), the other factors did. As the court noted, it was uncertain how close the conditions the jury would have encountered would have been to those under which Kelley made his observations four years earlier. Defendant contends that trial counsel's alternative request that the visit be conducted during daylight hours resolved any concerns in this area, but we disagree. Defendant presents no authority that lighting and distance are completely independent factors in determining

visibility. Common sense suggests, rather, that visibility is affected by both lighting and distance. Neither does defendant produce any authority that whatever Kelley saw under the original conditions would necessarily be as apparent under other conditions. It is possible, for example, that the glint of a knife blade under a street light at night could stand out more prominently than it would from the same distance in bright daylight. In any event, alternative means of testing Kelley's credibility were provided at trial by various witnesses, including two investigators from the public defender's office (recounted, *ante*, at p. 20), who described, diagrammed, and photographed the scene.

### 8. *Asserted Erroneous Exclusion of Evidence of Hollowhornbear's Military Training*

Defendant contends the trial court erred in excluding evidence of Hollowhornbear's military training. Outside the presence of the jury, defense counsel moved to admit Hollowhornbear's Army records to support the defense theory that Hollowhornbear, not defendant, killed the victim. The trial court observed that such records would be relevant if they reflected that Hollowhornbear had some training with the use of a knife or bayonet. The records, however, only indicated that he had received some sort of military training and that he had received a marksmanship badge for his skill with a rifle. There was no indication he had received training with a knife or bayonet. Defense counsel sought to supplement the military records with other documents describing the composition of basic combat training in the years that Hollowhornbear was in the service, and she made an offer of proof that she could call a witness to help in interpreting those documents. The trial court rejected the records and the offer of proof on the grounds that they would be unduly time consuming and would create substantial danger of confusing the issues and misleading the jury.

We see no abuse of discretion. The offered records did not indicate that Hollowhornbear had received training with a knife or bayonet. Defense counsel made an offer of proof to produce a witness to testify about the kinds of training that soldiers of that era generally received. But, as the trial court observed, such testimony would not have established what training Hollowhornbear actually received. It was well within the discretion of the court to exclude Hollowhornbear's military records and the speculative testimony required to explain their possible relevance, because presenting this evidence would have been time consuming and confusing to the jury.

### 9. *Asserted Failure to Instruct Fully with CALJIC No. 3.31*

Defendant contends the court inadequately instructed on the specific intent required for felony murder. Defendant contends that because he was charged

with felony murder, the court had a sua sponte duty to give CALJIC No. 3.31 on the concurrence of act and specific intent, and to either refer to other instructions that state that felony murder requires the specific intent to commit the underlying felony of robbery, or to specifically spell out this requirement in the instruction. The court gave the following instruction based on CALJIC No. 3.31, which defendant contends was inadequate or misleading: "In the crime charged in Count One of the Information, namely Murder, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator, and unless such mental state exists, the crime to which it relates is not committed. [¶] In the crime of Murder, the necessary mental state is to harbor malice aforethought, except in Felony-Murder, where the law imputes malice to a person who kills in perpetration of robbery or an attempt to perpetrate a robbery."

The essence of defendant's argument is that the court's definition of felony murder in this instruction explained what felony murder is *not*, instead of defining what it is. But, as defendant acknowledges, the court elsewhere correctly defined first degree felony murder through CALJIC No. 8.21 (4th ed. 1979), which stated, in pertinent part: "The unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs as a result of the commission of or an attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree." Defendant maintains that the definition of felony murder in CALJIC No. 8.21 says nothing about the concurrence of act and specific intent. But, as we have noted, in determining the correctness of jury instructions, we consider the instructions as a whole. (*People v. Hughes* (2002) 27 Cal.4th 287, 360 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Taken together, the trial court's giving of CALJIC Nos. 3.31 and 8.21 adequately instructed the jury on the concurrence of act and intent, and the specific intent required for felony murder.

> 10. *Asserted Erroneous Refusal to Give Special Jury Instruction on After-acquired Felonious Intent*

Defendant contends the trial court erred in refusing defendant's request to give the following special jury instruction on after-acquired felonious intent: "The prosecution must also prove beyond a reasonable doubt that the intent to commit the crime of robbery arose before or during the commission of the acts which resulted in the death of the victim. If you have a reasonable doubt that the defendant formed the intent to commit robbery before or during the commission of such acts, you may not convict him of first degree murder based on the felony murder rule."

The trial court rejected the proposed instruction, believing the point was covered by the following jury instruction the court gave based on CALJIC

No. 8.79 on the requisite specific intent to commit the underlying crime in felony murder: "Before the defendant may be found guilty of an unlawful killing of a human being as a result of the commission or attempt to commit the crime of robbery, you must take all the evidence into consideration and determine therefore if at the time of the commission or attempt to commit such crime the defendant did not form the specific intent to commit such crime. [¶] If, from all the evidence, you have a reasonable doubt whether the defendant formed such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

The trial court's instruction is not a model of clarity and it is arguable whether it adequately addressed the issue of when the intent to steal had to be formed in relation to the murder.[26] However, we need not reach that issue since the trial court also instructed with CALJIC Nos. 9.40 (robbery defined) and 8.21 (felony murder). As we have stated, "CALJIC Nos. 9.40 and 8.21 together ' "adequately cover the issue of the time of the formation of the intent to steal." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 112 [8 Cal.Rptr.3d 271, 82 P.3d 296], quoting *People v. Hughes, supra,* 27 Cal.4th at p. 359.) Because the issue was adequately covered by the existing instructions, the trial court did not err in refusing to give a duplicative special instruction. (See, e.g., *People v. Carter* (2003) 30 Cal.4th 1166, 1231 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Gurule* (2002) 28 Cal.4th 557, 659–660 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

11. *Asserted Failure to Instruct on Theft As a Lesser Included Offense of Robbery*

Defendant contends the trial court erred in failing to instruct on theft as a lesser included offense of robbery. As we conclude below, because there was no substantial evidence supporting theft, the trial court was not required to instruct on it.

a. *Background*

At trial, the defense and the prosecution presented polar opposite theories about whether defendant had participated in a robbery. The prosecution theory was that defendant had formed the intent to rob the bar prior to fatally stabbing the bartender, and that the attack was motivated to facilitate the robbery and to eliminate the bartender as a witness. The prosecution theory was supported by the fact that a substantial amount of money and some

---

[26] As defendant notes, the court's instruction is based on CALJIC No. 8.79 (4th ed. 1979), which, in its original form, instructs the jury on determining whether diminished capacity prevents a defendant from forming the requisite specific intent to commit the underlying felony in a charge of felony murder.

liquor bottles had been taken from the bar, by Kelley's testimony that defendant tried to enlist Kelley in the robbery, and by Kelley's and Moody's testimony that defendant admitted he committed the robbery and murder. In contrast, the defense theory, supported by defendant's testimony, was that defendant had nothing to do with the robbery or murder. Defendant testified that he at no point had the intention to steal or rob from the bartender, and he denied taking any money or liquor bottles from the bar. Defendant testified he fled the bar when Hollowhornbear pulled a knife on the bartender after the bartender tried to prevent Hollowhornbear from taking a bottle from behind the bar. The defense theory was that Hollowhornbear killed the bartender and then stole the cash and alcohol.

b. *Analysis*

"A criminal defendant has a constitutional right to have his or her jury determine 'every material issue presented by the evidence' and this includes the right, where appropriate, to have the jury instructed on lesser included offenses." (*People v. Abilez* (2007) 41 Cal.4th 472, 513 [61 Cal.Rptr.3d 526, 161 P.3d 58].) "Theft is a lesser included offense of robbery." (*Id.* at p. 514.) Accordingly, even in the absence of a request, the trial court has a sua sponte duty to instruct on theft as a lesser included offense of robbery if the evidence has raised "a question as to whether all of the elements of robbery were present and if there was evidence that would have justified a conviction of the lesser offense." (*Ibid.*)

Defendant contends that the trial court should have instructed about theft because the jury could have found that defendant stole from the bar. Defendant argues the jury could have accepted most of defendant's testimony but disbelieved defendant's testimony that he had not taken any of the money. Defendant contends that the jury could have concluded there was a fight instigated by Hollowhornbear's attempt to grab a bottle from the bar (as defendant described) but that (contrary to defendant's testimony) defendant did participate in the fight and later decided to take some money.

The problem with defendant's alternate scenario is that neither side presented substantial evidence to support it. As discussed, defendant presented no evidence that he decided to steal only after the murder; indeed, he categorically maintained he never took anything. Defendant now contends that the evidence the prosecutor presented that money and alcohol had been taken from the bar could have been considered by the jury, in isolation, to support the conclusion that defendant engaged in a theft. But there was no reason why the jury would have rejected the prosecution's evidence that defendant committed a robbery. (*People v. Abilez, supra,* 41 Cal.4th at p. 514.) As we have stated, " 'if there is no proof, other than an unexplainable

rejection of the prosecution's evidence, that the offense was less than that charged, such instructions [on lesser included offenses] shall not be given.' " (*Ibid.*, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1063 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Here based on the evidence presented, the jury was left with "an all-or-nothing choice": the jury could either find that defendant had committed the robbery murder or it could find that he had committed no crime. (*People v. Abilez, supra,* 41 Cal.4th at p. 515.) There was no substantial evidence that defendant formed an intent to steal only after he or Hollowhornbear fatally stabbed the victim, and thus no factual predicate for instructing the jury on theft as a lesser included offense. (*Id.* at p. 514.)

### 12. *Asserted Error in Instructing with CALJIC No. 4.22 (Definition of Voluntary Intoxication)*

Defendant contends the trial court erred in instructing with CALJIC No. 4.22 (1981 rev.) (4th ed. 1979), which stated: "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect, or when he willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance." Defendant contends that CALJIC No. 4.22 conflicted with CALJIC No. 4.21, which the court also gave, and which states that evidence of intoxication can create a reasonable doubt as to whether defendant had the required specific intent for a charged specific intent crime.[27] Defendant contends the definition of voluntary intoxication in CALJIC No. 4.22, with its reference to "willingly assum[ing] the risk" of the effect of intoxication, would lead the jury to misunderstand or ignore CALJIC No. 4.21. We have previously rejected such a claim and do so again here. (*People v. Harris, supra,* 43 Cal.4th at pp. 1312–1313; *People v. Cain* (1995) 10 Cal.4th 1, 38–40 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

### 13. *Asserted Error in Instructions on Consciousness of Guilt*

Defendant contends the court should not have given two instructions on consciousness of guilt, CALJIC No. 2.06, on efforts to suppress evidence, and

---

[27] The court instructed with CALJIC No. 4.21, as modified: "In the crime of Murder, of which the defendant is accused in Count One of the information, a necessary element is the existence in the mind of the defendant of the mental state of malice aforethought, except in Felony Murder. [¶] In the crime of Robbery, of which defendant is accused in Count Two of the Information, a necessary element is the existence in the mind of the defendant of the specific intent to permanently deprive the person of the property. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if the defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent or mental state as to either count, you must give the defendant the benefit of the doubt and find that he did not have such specific intent or mental state."

CALJIC No. 2.52, on flight after crime, because they were repetitive of other jury instructions about circumstantial evidence, were argumentative, and allowed the jury to draw irrational inferences. As defendant acknowledges, we have rejected similar claims in the past, and we do so again here. (*People v. Rundle*, *supra*, 43 Cal.4th at pp. 77–78 [CALJIC No. 2.52]; *People v. Hughes*, *supra*, 27 Cal.4th at p. 348 [CALJIC No. 2.06].)

> 14. *Asserted Error in Instructing with CALJIC No. 2.51 (Consideration of Motive)*

Defendant contends the court should not have given CALJIC No. 2.51, which allows the jury to consider the presence or absence of motive as a circumstance in the case that may establish guilt or innocence. Defendant contends this instruction is unconstitutional because it allows the jury to determine guilt based on motive alone, and lessens the prosecutor's burden of proof. As defendant acknowledges, we have rejected similar claims in the past, and we do so again here. (*People v. Riggs* (2008) 44 Cal.4th 248, 314 [79 Cal.Rptr.3d 648, 187 P.3d 363]; *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

> 15. *Unconstitutionality of Jury Instructions Assertedly Affecting the Reasonable Doubt Standard*

Defendant contends that several standard CALJIC instructions violated his right, under *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068], not to be convicted of a crime on a standard of less than beyond a reasonable doubt. Defendant acknowledges we previously have rejected similar challenges to these instructions, but requests we change our position. We decline to do so and summarily reaffirm our previous holdings upholding the constitutionality of the following instructions: CALJIC No. 2.90 (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 221 [79 Cal.Rptr.3d 125, 186 P.3d 496]); CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1 (*People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Guerra*, *supra*, 37 Cal.4th at p. 1139); CALJIC Nos. 1.00 and 2.51 (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1139); CALJIC No. 2.21.1 (*People v. Brasure* (2008) 42 Cal.4th 1037, 1059, fn. 15 [71 Cal.Rptr.3d 675, 175 P.3d 632]); CALJIC Nos. 2.21.2, 2.22 (*People v. Nakahara*, *supra*, 30 Cal.4th at pp. 714–715; *People v. Guerra*, *supra*, 37 Cal.4th at pp. 1138–1139); CALJIC No. 2.27 (*People v. Montiel* (1993) 5 Cal.4th 877, 941 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Turner* (1990) 50 Cal.3d 668, 697 [268 Cal.Rptr. 706, 789 P.2d 887]); and CALJIC No. 8.20 (*People v. Nakahara*, *supra*, 30 Cal.4th at p. 715).

### 16. *Instruction on First Degree Murder*

▮▮▮ Defendant contends the trial court erroneously instructed on first degree murder because, while the information charged him with first degree murder in violation of section 187 (malice murder), it did not, he contends, cite the actual first degree murder statute (§ 189) or allege the facts necessary for establishing first degree murder. As defendant acknowledges, however, we have consistently rejected such arguments and have concluded that a defendant may be convicted of first degree murder even though the indictment or information charges only murder with malice in violation of section 187. (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 222; *People v. Hughes, supra,* 27 Cal.4th at pp. 368–370; *People v. Witt* (1915) 170 Cal. 104, 107–108 [148 P. 928].) Defendant also contends that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], prohibits defendant's conviction on an uncharged crime. His reliance on *Apprendi,* however, is misplaced because he was not convicted of an "uncharged crime." (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 222.)

### 17. *Failure to Instruct on Unanimity for Theory of First Degree Murder*

Defendant contends the trial court erred in failing to instruct the jury that it was required to agree unanimously as to whether defendant had committed a premeditated murder or a first degree felony murder. As defendant acknowledges, however, we previously have rejected the claim that a jury cannot return a valid verdict of first degree murder without first agreeing unanimously as to whether the defendant committed a premeditated murder or a felony murder. (*People v. Nakahara, supra,* 30 Cal.4th at pp. 712–713; *People v. Kipp* (2001) 26 Cal.4th 1100, 1132 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

### 18. *Failure to Give* Dewberry *Instruction, CALJIC No. 8.71*

▮▮▮ Defendant contends the trial court erred in failing to give CALJIC No. 8.71, which instructs the jury that if they unanimously agree defendant committed murder but have a reasonable doubt whether the murder was of the first or of the second degree, they should give the defendant the benefit of the doubt and return a verdict of second degree murder. We conclude the omitted instruction was adequately covered by the other instructions the court gave.

#### a. *Background*

After the court finished instructing the jury, it asked counsel whether all the instructions it had agreed to give to the jury were in fact given. Defense

counsel noted the omission of CALJIC No. 8.71, one of the so-called *Dewberry* instructions (*People v. Dewberry* (1959) 51 Cal.2d 548 [334 P.2d 852]). The court reviewed the instructions it had given related to *Dewberry* and lesser offenses. The trial court had instructed with CALJIC No. 8.70 on the duty of the jury as to the degree of murder,[28] and pursuant to CALJIC No. 8.72 on doubt as to murder or manslaughter,[29] but not with CALJIC No. 8.71 on doubt as to first or second degree murder. The trial court also gave an instruction pursuant to CALJIC No. 17.10, which stated, inter alia: "If the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged and it unanimously so finds, it may convict him of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense. [¶] The offense of murder in the second degree is a lesser offense of the offense charged in Count I. [¶] The offense of voluntary manslaughter is a lesser offense to the offense charged in Count I." After considering the other instructions it had given, the court concluded that the content of CALJIC No. 8.71 was adequately covered.

b. *Analysis*

We held in *People v. Dewberry* that "a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to all crimes with lesser degrees or related or included offenses." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262 [74 Cal.Rptr.2d 212, 954 P.2d 475], italics omitted, citing *People v. Dewberry*, *supra*, 51 Cal.2d at p. 556.) CALJIC Nos. 8.70, 8.71, and 8.72 instruct the jury as to the degrees of murder and this principle from *Dewberry*. CALJIC No. 8.70 describes the two degrees of murder and instructs the jury, if they find defendant guilty of murder, to state in the verdict the degree of which they are finding him guilty. CALJIC Nos. 8.71 and 8.72 apply the *Dewberry* benefit of the doubt principle to deciding between first and second degree murder and between murder and manslaughter, respectively. It is true that the trial court omitted CALJIC No. 8.71 with its specific application of the *Dewberry* principle to second degree murder. But the court instructed with CALJIC No. 17.10, which stated the general principle that if the jury was not satisfied beyond a reasonable doubt that defendant was guilty of first degree murder (count one) it could convict him of a lesser offense if it was convinced beyond a reasonable doubt that he was guilty of that lesser offense. CALJIC No. 17.10 then specified the two

---

[28] "Murder is classified into two degrees. If you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree." (CALJIC No. 8.70 (5th ed. 1988).)

[29] "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder."

available lesser offenses as either second degree murder or voluntary manslaughter. This instruction told the jury that both of these two lesser offenses were conclusions the jury could reach if it had a reasonable doubt whether defendant was guilty of first degree murder. Furthermore, two other instructions the court gave, a modified version of CALJIC No. 8.79 on felony murder and felonious intent (*ante*, pp. 49–50) and a modified version of CALJIC No. 4.21 on voluntary intoxication and specific intent (*ante*, p. 52, fn. 27) also instructed the jury on the general principle that if, from all the evidence, it had a reasonable doubt whether defendant formed a specific intent or mental state, it must give him the benefit of that doubt and find he did not have that specific intent or mental state. Thus, despite the court's omission of CALJIC No. 8.71, the jury would have understood that the *Dewberry* benefit of the doubt principle was equally applicable both to the choice between first and second degree murder, and the choice between murder and manslaughter.

B. *Second Trial: Special Circumstance Retrial (Guilt Phase)*

1. *Asserted* Witt *Error*

Defendant contends the trial court erred in excusing 10 prospective jurors based on their views concerning the death penalty. As we explain, we conclude the trial court did not err in these rulings.

a. Witt *Standard*

The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is " '[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2223], citing *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Applying *Witt*, we have stated: " ' " '[a] prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" . . . In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Blair* (2005) 36 Cal.4th 686, 743 [31 Cal.Rptr.3d 485, 115 P.3d 1145], quoting *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

b. *Asserted Error Based on the Court's Description of the Case*

In its individual voir dire of the prospective jurors, the trial court used the following procedure: First, the trial court asked the prospective juror about his or her general feelings about imposing the death penalty. Next, the trial court presented a brief summary of the facts of the case, and asked the prospective juror whether he or she would be able to apply the death penalty for this particular kind of case. The court gave the following description of the case: Defendant and two other individuals went into the Golden West Bar; there was an altercation or confrontation and the bartender was robbed and fatally injured by having his throat cut almost to the point of decapitation. The court did not specify whether defendant was the actual perpetrator of the murder, but it informed prospective jurors that the previous jury had found defendant guilty of first degree murder and robbery, and had found he personally used a knife during the robbery and murder, and personally inflicted great bodily injury during the robbery.

Defendant contends that because the trial court's sketch of the crime did not specify that defendant was the actual killer or shared the killer's intent to kill, the sketch did not describe a death-eligible killing for this "*Carlos* window" case.[30] Defendant further asserts that, in order to properly convey the gravity of the crime and evaluate prospective jurors' willingness to apply the death penalty, the trial court should have specifically told prospective jurors that defendant personally committed the murder. Defendant contends that the trial court's assertedly misleading "watered-down" account of the facts of the case caused Prospective Jurors F.S., F.W., H.S., and D.A., who had reasonable reservations about the death penalty, to express their unwillingness to apply it in this case. As we conclude below, we reject defendant's contentions and uphold the trial court's dismissal of these jurors.

(1) *Facts*

(a) *Prospective Juror F.S.*

In his questionnaire, F.S. wrote: "As a Jew, I am opposed to the death penalty." Asked by the court about this statement, he stated that it was "probably true" that he would never vote for the death penalty. After the court explained aggravating and mitigating factors, and asked him whether he had any feelings about either the death penalty or life without the possibility of

---

[30] The so-called "*Carlos* window" is the period between *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and its being overruled in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], during which time intent to kill was an element of the robbery-murder special circumstance.

parole that he thought might prevent him from making a choice between those two penalties, he stated that he had "very strong biases about the death penalty." The trial court then stated the concise version of the facts of the crime, as described, *ante*, at page 57. F.S. asked whether defendant was "the perpetrator of the crime or an accessory," to which the trial court answered: "Well, that's for the jury to decide. That's what you are going to have to decide in this case." The trial court asked F.S. whether the case as described came up to his "level of expectation" as to what a death penalty case should be, and he stated that it did not.[31] Defense counsel sought to ask F.S. whether believing beyond a reasonable doubt that defendant was the actual perpetrator and not an accessory would allow him to keep both penalties in mind. The court sustained the prosecutor's objection to this question on the ground that it would be asking the prospective juror to prejudge the evidence. The court then sustained the prosecution's challenge for cause.

### (b) *Prospective Juror F.W.*

The court asked F.W. whether he thought he could personally ever vote to execute another human being and he answered: "The possibility is yes, but I would say that's very remote." Following further questioning by the court, F.W. stated that he could vote to execute someone in "an appropriate case," but went on to add that he had never heard of nor could he imagine a case in which he felt someone should receive the death penalty. The court recounted its description of the case, and asked him whether he could consider death as a possible penalty in this case. F.W. indicated that, based on those facts, he would say no to the death penalty. The defense posed no questions, and the trial court sustained the prosecutor's challenge for cause.

### (c) *Prospective Juror H.S.*

The court asked H.S. whether she could ever vote to execute another human being, to which she answered she did not think she could. After further questioning, she stated that if she was being asked to try Hitler she could vote for the death penalty, but in "all reasonable circumstances" she would vote no on the death penalty. Although she thought she was "not so rigid" that she would never under any circumstances vote for death, she was "not very prone to do it." The court described the case, and asked her whether both penalties were still open to her. She indicated that the case as

---

[31] The trial court used the word "expectation" as a shorthand for a prospective juror's willingness to consider imposing the death penalty based on the sketch of the facts presented, not as a suggestion that the juror prejudge the penalty phase. The trial court made this clear by stating to this prospective juror, "Now, I'm not asking you how you will vote in this case because you haven't heard all the rest of the evidence." The trial court gave similar explanations to the other prospective jurors.

described did not have the gravity that would justify the death penalty. The defense posed no questions, and the trial court sustained the prosecutor's challenge for cause.

### (d) *Prospective Juror D.A.*

D.A. described her general feeling that she was more inclined towards life in prison and that "[i]t would have to be a very extreme thing" for her to vote for the death penalty. The court described the case, and asked her whether both penalties were still open to her. She stated she had eliminated the death penalty as a possible punishment because the case did not come up to her expectations of what a death penalty case would be. The defense posed no questions, and the trial court sustained the prosecutor's challenge for cause.

### (2) *Analysis*

We reject defendant's initial general contention that the trial court's description of the case was insufficient to support a death penalty under *Carlos v. Superior Court, supra,* 35 Cal.3d 131, for which intent to kill is an element of the robbery-murder special circumstance. The trial court explained to the prospective jurors that they would not even reach the penalty phase unless they found true the special circumstance that defendant committed "an intentional killing during the commission of a robbery."

Turning to defendant's challenge of the dismissals of Prospective Jurors F.S., F.W., H.S., and D.A., we conclude the trial court's rulings were fairly supported by the record. (*People v. Blair, supra,* 36 Cal.4th at p. 743.) All of these jurors indicated their inability to apply the death penalty in the type of case described to them, but to the extent their responses can be seen as conflicting or ambiguous we accept the trial court's determination of each juror's true state of mind. (*Ibid.*)

We also reject defendant's contention that the trial court's assertedly misleading description of the case caused these jurors to express an unwillingness to impose the death penalty. First, this argument is speculative; we can judge the views of prospective jurors based only on what they actually said, not on what they might have said under other circumstances. Second, we reject defendant's contention that the court's description was misleading. As we have stated, death-qualification voir dire must avoid two extremes: on the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties; on the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty. (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1120–1121.) We defer to the trial court's discretion

regarding the manner of conducting voir dire. (*People v. Navarette* (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Here the trial court gave a concise but accurate description of the case.

Defendant contends the trial court should have told the prospective jurors during voir dire that defendant personally committed the murder. The trial court, however, was within its discretion in declining to so characterize the case to the prospective jurors. The jury in the first trial made no specific finding that defendant had personally committed the murder.[32] As the trial court indicated, who personally committed the murder remained an issue for the jurors in the special circumstance retrial to determine.[33] We also see no error in the trial court's sustaining of the prosecution objection to defense counsel's asking Prospective Juror F.S. whether he would consider returning the death penalty against defendant if he believed beyond a reasonable doubt that defendant was the actual perpetrator of the murder. As noted, the trial court has wide discretion in the manner of conducting voir dire. (*People v. Navarette, supra,* 30 Cal.4th at p. 490.) Because the trial court thought the question would require the prospective juror to prejudge the evidence in the case, the court was within its discretion to exclude it.

### c. *Error Based on Lack of Sufficient Showing of Substantial Impairment*

Defendant contends that the following six prospective jurors were dismissed in violation of *Witt* because their voir dire did not indicate their views

---

[32] Defendant was found guilty of first degree murder and robbery, and the allegations he personally used a knife in the commission of the murder and robbery, and personally inflicted great bodily injury in the commission of the robbery, were found true. Although these verdicts strongly suggest the first jury believed defendant was the actual killer, they do not, as a matter of law, create a factual finding to that effect. As the trial court indicated, the first jury's verdicts could apply under the following scenario in which defendant was not the actual killer: In the course of the robbery, defendant begins stabbing the victim, inflicting great bodily injury but not fatally injuring him. Then Hollowhornbear (also armed with a knife) actually fatally injures the victim. Defendant would be guilty of first degree felony murder as a confederate jointly engaged in a robbery during the course of which his fellow confederate killed. (See *People v. Pulido* (1997) 15 Cal.4th 713, 719–722 [63 Cal.Rptr.2d 625, 936 P.2d 1235] [reviewing nonkiller complicity for felony murder].) Under this scenario, defendant would also be guilty of the personal knife use and great bodily injury enhancements, even though he was not the actual killer.

[33] Indeed, defense counsel went on to raise the issue in his opening statement of the special circumstance retrial "whether or not Jack Friend personally did the killing or whether or not Eugene Hollowhornbear personally did the killing or whether or not Kevin Kelley personally did the killing." In closing argument, defense counsel likewise left open the question of who had actually committed the murder.

on the death penalty would substantially impair their ability to perform their duties as jurors. As we conclude below, the trial court did not err in dismissing these jurors.

### (1) Prospective Jurors R.A. and S.M.

The court engaged in a lengthy voir dire with R.A., in which she stated her ambivalence towards applying the death penalty. R.A. indicated that she was "slightly schizophrenic," and that she always had "two sides to [her] mind." When the trial court reiterated the question whether she could vote for the death penalty if she felt it was the appropriate penalty in this case, she answered: "I think I can, but I don't know if I'd like it. I don't know if I'd like myself if I did it. I don't know." Over defense counsel's objection, the trial court upheld the prosecutor's challenge for cause, explaining R.A. would be unable to make up her mind.

Prospective Juror S.M. stated numerous times that she did not know whether she could ever vote for the death penalty, and apologized for "vacillating." Over the objection of defense counsel, the trial court upheld the prosecutor's challenge for cause, explaining S.M. would be unable to make up her mind.

The dismissals of R.A. and S.M. were fairly supported by the record. (*People v. Blair, supra,* 36 Cal.4th at p. 743.) The answers of both of these prospective jurors supported the trial court's conclusion that they could not make up their minds whether they could ever vote for the death penalty, even though the court gave them numerous opportunities to clarify their position. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 980–981 [108 Cal.Rptr.2d 291, 25 P.3d 519] [juror properly excused when court determined her to be " 'extremely indecisive' " on the death penalty].)

### (2) Prospective Juror J.A.

In a lengthy voir dire, Prospective Juror J.A. indicated that he could only consider imposing the death penalty on a Ted Bundy-type serial murderer, whom the state previously had made "every possible effort" to rehabilitate. When the court asked him whether the current case came up to his expectations for a death penalty case, J.A. indicated that it was "almost impossible" for it to do so. Without objection by defense counsel, the trial court upheld the prosecutor's challenge for cause. The record thus fairly supported the trial court's dismissal of J.A. on the basis that he was unwilling to consider the death penalty for a defendant who had committed only one murder.

### (3) *Prospective Juror T.L.*

In response to the court's general question of whether she could ever vote to execute another human being, T.L. stated "probably not." She indicated that choosing the death penalty would cause her "psychological distress," which would "really haunt her for a long time." She acknowledged she could not be fair and impartial in the case. Without objection by defense counsel, the trial court upheld the prosecutor's challenge for cause. The record fairly supported the trial court's dismissal of T.L. on the basis that her concerns about being haunted by her decision prevented her from considering the death penalty.

### (4) *Prospective Juror V.D.*

V.D., a practicing Hindu, indicated on his questionnaire that he had to consult the elders in his religious community about serving on a death penalty trial. In voir dire, he told the court that the elders had told him his religion would not allow him to impose the death penalty. He said that he did not think he could impose the death penalty even if he felt it was deserved. Without objection by defense counsel, the trial court upheld the prosecutor's challenge for cause. The record fairly supported the trial court's dismissal of V.D. on the basis that his religious beliefs precluded him from applying the death penalty.

### (5) *Prospective Juror C.E.*

In voir dire, although initially stating her willingness to impose both penalties, C.E.'s brief answers indicated a hesitancy that led the court and the prosecutor to ask further questions. She then stated she did not know whether she could vote for the death penalty, and ultimately said she could not select the death penalty even if she felt it was appropriate in the case. Without objection or questioning by defense counsel, the trial court upheld the prosecutor's challenge for cause.

Defendant contends the trial court wore C.E. down by repeated questioning. But we conclude the dismissal of C.E. was fairly supported by the record. The court appropriately sought clarification of C.E.'s brief answers, and this further questioning revealed her inability to consider the death penalty as a sentencing option.

## 2. *Asserted Prosecutorial Misconduct*

### a. *Asserted Elicitation of Evidence Ruled Inadmissible*

Defendant contends the prosecutor committed misconduct in the second trial by eliciting testimony about two areas that had been ruled inadmissible

by the court's in limine rulings in the first trial: (1) defendant's prior incarceration and (2) his prior troubles at the Oasis convenience store.

### (1) Defendant's Prior Jail Time

In the second trial, defendant's prior jail time was first mentioned during the prosecutor's examination of Kelley, when Kelley, in recalling his rejection of defendant's proposal to rob the bar, stated: "I said, I'm not interested. I'm trying to stay out of trouble. You just got out of jail. I tried to talk him out of it." Defense counsel did not object to this testimony. Later, the prosecutor returned to the issue, and asked Kelley how long defendant had been out of jail. Defense counsel objected on the grounds that the question was not relevant and that it was prejudicial. The court initially overruled the objection. A few minutes later, when the prosecutor made another reference to defendant's having gotten out of jail, defense counsel again objected that this was prejudicial. The court correctly observed that defense counsel had not objected the first time Kelley had mentioned it, but instructed the jury to disregard any reference to it, and asked the prosecutor not to bring it up. Later, at a session without the jury, defense counsel again objected to the prosecutor's references to defendant's prior jail time, and raised the issue that he thought there had been an in limine ruling in the first trial precluding mention of it. The trial judge explained that while he probably had made that ruling in the first trial, what he saw as the problem now was that defense counsel had not objected the first time it had been raised in the second trial. Defense counsel then moved for a mistrial, which the court denied. In closing argument, despite the court's instruction, the prosecutor, in the course of condemning defendant's moral code, mentioned defendant's prior jail time again, stating "Kelley says: You can't rob. You just got out of jail."

We conclude defendant was not prejudiced. While it is true the trial judge stated he "just assumed that rulings [he] made [at the first trial] would be observed by the prosecution" at the second trial, defendant presents no authority that the rulings of the first trial were applicable to the second trial absent a stipulation by the parties to that effect. (Cf. *People v. Humphries* (1986) 185 Cal.App.3d 1315, 1329–1330 [230 Cal.Rptr. 536] [the parties stipulated that in limine rulings of first trial court would apply to retrial], abrogated on another ground in *People v. Carter, supra,* 30 Cal.4th at p. 1197.) More importantly, as the trial court explained to defense counsel, the failure to object when defendant's prior jail time was first mentioned during the second trial made it hard for the court to "unring [the] bell," although the court did instruct the jury to disregard the references. As respondent acknowledges, the prosecutor's reference to defendant's prior jail time during summation violated the judge's order. But the claim is forfeited for failure to object. Moreover, we conclude that there was no prejudice to

defendant. The reference was brief, and the jury had been both generally instructed not to treat closing argument as evidence, and specifically instructed to disregard any reference to defendant's prior jail time.

### (2) *Reference to Trouble at the Oasis*

As discussed, *ante*, at page 34, at the first trial, the court ruled that Kelley was not to mention that defendant was unwelcome at the Oasis convenience store because he had been caught stealing, although it permitted Kelley to testify generally that defendant had gotten into trouble there in the past. In the second trial, the prosecutor asked Kelley why defendant, Hollowhornbear, and Kelley had not gone to the Oasis. Defense counsel objected on relevance grounds, which was overruled, and then on hearsay grounds, which the court sustained. Later, at the end of the court day, outside the presence of the jury, the court recalled its ruling from the first trial, and instructed the prosecutor "not to mention anything about the Oasis" and "not to mention anything about Friend getting thrown out of the Oasis, the guy caught him stealing or something like that." During the prosecutor's redirect examination, he again asked Kelley why the group had not gone to the Oasis. Defense counsel objected, pointing to the court's ruling in the first trial. The prosecutor rephrased the question as "Did Mr. Friend say that he couldn't go to the Oasis bar or market?," and the court allowed this question.

The question the prosecutor asked Kelley at the second trial was clearly permissible under the court's ruling at the first trial. Defendant points to the court's broad instruction at one point in the second trial not to mention "anything about the Oasis." But the trial court immediately followed that with the more specific instruction not to mention "the guy caught him stealing," which was the same ruling as in the first trial. That the trial court merely meant to reiterate rather than broaden its ruling from the first trial is indicated by the fact the court permitted the question whether defendant had said he "couldn't go" to the Oasis, which was a question that did not raise the issue of defendant's past stealing there.

### b. *Asserted Impugning of Defendant's Brother*

Defendant contends the prosecutor engaged in misconduct by indirectly suggesting that defendant's brother had killed Moody (who, as discussed, *post*, at pp. 65–68, had gone missing before the second trial, and was declared an unavailable witness). During his rebuttal summation, the prosecutor addressed the defense argument that the prosecution had put Moody in the victim/witness protection program and moved him into an apartment in Hayward as a benefit to Moody. The prosecutor referred to Moody's statement that he had heard that defendant's brother had been released from

prison and that he was afraid for his own life. The prosecutor said that Moody would have been vulnerable if he had stayed in the warehouse, and that this was the reason the prosecutor had moved him to Hayward until he testified. The prosecutor noted that, if a witness becomes unavailable after testifying, his testimony can be read into the record at the next trial. He then stated that he "was not by any stretch of the imagination trying to infer [*sic*] that Jerry Friend [defendant's brother] had done anything to Moody," but "that's the point."

Defense counsel failed to object and therefore defendant's claim is forfeited on appeal. Moreover, on the merits, the prosecutor's comments were proper. In order to rebut the defense argument that the prosecution had housed Moody as a benefit in exchange for Moody's testimony, the prosecutor could properly present a legitimate security-related reason for housing Moody based on Moody's expressed fear of being harmed by defendant's brother. The prosecutor's reference to Moody's unavailability at the second trial in relation to defendant's brother was a bit cryptic, but the prosecutor could properly emphasize the possibility of danger to Moody underlying the decision to house him in Hayward.

### c. *Asserted Attacks on Counsel*

Defendant cites several instances of what he characterizes as the prosecutor's attacks on defense counsel. We note that the trial court at one point admonished both the prosecutor and defense counsel "to start acting like lawyers" and to keep their personal comments to themselves. We have reviewed the instances defendant cites, and, while we cannot condone the prosecutor's occasional sniping remarks, we conclude they do not amount to prejudicial misconduct.

### d. *Leading Questions*

As with his claim of prosecutorial misconduct relating to his first trial, defendant presents several instances in the second trial of the prosecutor's use of leading questions. Defense counsel's repeated objections to leading questions were frequently sustained. Indeed, the court made sua sponte objections to some of the prosecutor's questions as leading. Given this record, we conclude defendant suffered no prejudice.

### 3. *Assertedly Erroneous Admission of Moody's Testimony from the First Trial*

As recounted, *ante*, at pages 14 and 15, Thomas Moody, a fellow alcoholic transient and associate of defendant's at the warehouse, testified at defendant's first trial that defendant admitted he committed the robbery murder.

However, for the special circumstance retrial Moody could not be located. Following a hearing outside the presence of the jury, in which the prosecutor presented evidence of his unsuccessful efforts to find Moody, the court ruled that the prosecution had exercised due diligence in attempting to locate him, and declared him an unavailable witness. Moody's testimony from the first trial was then read to the jury. Defendant contends the trial court erred, but, as we conclude below, Moody's testimony from the first trial was properly admitted.

### a. *Background*

On January 19, 1990 (which was about a year and a half before the special circumstance retrial commenced in the fall of 1991), the defense served a subpoena on Moody (who was then incarcerated at Santa Rita Jail) to appear as a witness at a discovery hearing to be held on March 26, 1990. Moody failed to appear, and the court eventually ordered that a warrant of attachment issue. On April 24, 1990, the sheriff attempted to serve the warrant at an address at which Moody's father had once lived, but Moody was not there.

After several continuances, the special circumstance retrial was scheduled to begin in September 1991. In the summer of 1991, investigators from the district attorney's office began searching for Moody, but were unable to find him. The prosecutor moved to have Moody declared an unavailable witness, and on February 26, 1992, the day before the jurors were sworn for his second trial, the court held a hearing on the motion.

Moody's father, Dean Moody (Dean), testified that either in June or July of 1990, Moody stayed with him for about a week. Moody had a cast on his foot and was receiving treatment at a local hospital. One day Moody said he was going to the store, left the house, and never returned. Dean never saw or heard from him again. About a year later, in the summer of 1991, Dean was contacted by Inspector Brierly of the district attorney's office, who was trying to locate Moody. Dean then made some inquiries and drove by some of Moody's old haunts, but with no results. Dean testified that, although Moody was an alcoholic transient, Moody had, until his disappearance in the summer of 1990, always contacted Dean at least once every six months, if only to borrow money.

Prosecutor Landswick testified that he last saw Moody in either May or June of 1990, when Moody unexpectedly dropped by his office. Landswick refused Moody's request for money, but drove him to a garage where he was staying at the time in East Oakland or San Leandro. Landswick testified that because the special circumstance retrial was scheduled to begin in September 1991, his office had no reason to contact Moody until the summer of 1991,

when they began to prepare for trial. At this point Landswick asked Inspector Richard Brierly to look for Moody. Up to this time, the investigators in the district attorney's office had always succeeded in getting Moody to call them by contacting Moody's father.

Robert Gannon, an inspector with the district attorney's office, testified about his contacts with Moody. In October 1984, Gannon had put Moody into the witness protection program, and Gannon communicated with Moody into 1990. Moody would call him periodically to give him his new address and phone number, and sometimes asked for money. In 1990, Gannon met with Moody three or four times, and brought him in for interviews with Landswick. The last contact Gannon had with Moody was on July 17, 1990, when Moody called Gannon and told him he was staying at an address in Richmond. He told Gannon he was unemployable because he had a broken foot.

Inspector Brierly testified to an extensive but unsuccessful investigation he made to locate Moody beginning in July 1991 and continuing up to the time of the hearing in February 1992. Brierly contacted Moody's family and friends, former employers, places of residence, hospitals, and jails. He ran Moody's name through state and federal databases and contacted police in other major western cities.

b. *Analysis*

"A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him [or her]. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right, however, is not absolute. The high court . . . reaffirmed the long-standing exception that '[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 340 [30 Cal.Rptr.3d 513, 114 P.3d 758], quoting *Crawford v. Washington, supra,* 541 U.S. at p. 59.) "Evidence Code section 1291 codifies this traditional exception." (*People v. Wilson, supra,* 36 Cal.4th at p. 340.) "When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' " (*Ibid.,* quoting *People v. Mayfield, supra,* 14 Cal.4th at p. 742.)

"Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was

given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' . . . Evidence Code section 240, subdivision (a)(5), states a declarant is 'unavailable as a witness' if [he or she] is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' " (*People v. Wilson, supra,* 36 Cal.4th at p. 341.)

"The term 'reasonable diligence' or 'due diligence' under Evidence Code section 240, subdivision (a)(5) ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citations.]" ' " (*People v. Wilson, supra,* 36 Cal.4th at p. 341, quoting *People v. Cromer* (2001) 24 Cal.4th 889, 904 [103 Cal.Rptr.2d 23, 15 P.3d 243] ["reasonable diligence same as due diligence"].) "Considerations relevant to this inquiry include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*People v. Wilson, supra,* 36 Cal.4th at p. 341.) "We independently review a trial court's due diligence determination." (*Ibid.*)

Defendant does not dispute that, during the period between July 1991 and February 1992 (when the due diligence hearing was held), the prosecutor made concerted efforts to locate Moody. Rather, defendant's contention is the prosecutor failed to exercise due diligence in maintaining contact with Moody in the period from March 1990 (when Moody failed to respond to the subpoena for the pretrial discovery hearing) through July 1991 (when the prosecution first began to make concerted efforts to locate him). Additionally, defendant contends that the prosecutor should have taken some steps "to prevent Moody from absenting himself" in the period prior to defendant's second trial.

As to whether the prosecutor should have maintained regular contact with Moody in the period between March 1990 and June 1991, we have noted that "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' " (*People v. Wilson, supra,* 36 Cal.4th at p. 342, quoting *People v. Hovey* (1988) 44 Cal.3d 543, 564 [244 Cal.Rptr. 121, 749 P.2d 776].) We have also stated that when there is knowledge of "a 'substantial risk' " that an " 'important witness would flee,' " the prosecutor is required to " 'take adequate preventative measures' to stop the witness from disappearing." (*People v. Wilson,* at p. 342.)

Here, however, the record does not reflect that the prosecutor had any knowledge of or reason to know of a substantial risk that Moody would flee or otherwise disappear. Defendant contends that Moody's transient lifestyle generally created the risk that Moody would permanently disappear. But

testimony at the due diligence hearing established that, although Moody was a transient, he stayed within the general vicinity of Oakland and had maintained contact with various individuals such as his father and Inspector Gannon.

Defendant points to the fact that Moody did not appear for the March 1990 discovery hearing, and contends that this should have put the prosecutor on notice that Moody was at risk of going missing. But both Prosecutor Landswick and Inspector Gannon testified they had contact with Moody after that date (in May or June, and July of 1990) and that his general circumstances appeared unchanged. The fact that Moody had missed one hearing date did not create a substantial risk that he would permanently disappear.

Finally, defendant criticizes the prosecutor for waiting until July 11, 1991, to start actively searching for Moody. But this date was not unreasonable given that the second trial, which had been continued several times, was scheduled to begin in September of 1991. Based on our review of the record, we therefore conclude the prosecutor met the standard of due diligence and that the trial court therefore did not err in determining that Moody was " 'unavailable as a witness.' " (Evid. Code, § 240.)

### 4. *Assertedly Erroneous Instructions on the Scope of the Jury's Findings*

With minor modification, the court instructed the jury at the special circumstance retrial with the same instructions it had given at the first trial. The court gave the full panoply of homicide instructions, including those on the two theories of first degree murder considered at the first trial: felony murder and premeditated and deliberate murder. Defendant contends that, beyond telling the second jury that defendant had been convicted of first degree murder, robbery, use of a knife and inflicting great bodily injury, the trial court should not have instructed the jury on any other substantive crimes. Alternatively, defendant contends that if the jury was to be instructed on a theory of first degree murder, the trial court should have instructed only on felony murder, not premeditated first degree murder, because, as defendant contends, the jury in the first trial convicted defendant on the former theory, not the latter. Finally, defendant contends that instructing the jury with both theories of first degree murder resulted in a directed verdict on the special circumstance allegation because the instructions implied that defendant had been found guilty under both theories. As we conclude below, the trial court did not err in its homicide instructions.

### a. *Assertedly Erroneous Homicide Instructions*

#### (1) *Background*

Outside the presence of the jury, the court, the prosecutor, and defense counsel reviewed the jury instructions that had been agreed to, modified, and objected to. All agreed that, with some minor modifications, the vast majority of the jury instructions given at the first trial should also be given at the special circumstance retrial.[34] In instructing the jurors on murder, the trial court stated: "I'm telling you this because we want you to know the theories that could be applied in this case." The trial court also stated: "You know already that the defendant has been found guilty of murder of the first degree, and that's another reason that we want to tell you the definition of what murder is." The trial court told the jury not to speculate as to the reasons the prior jury reached the verdicts it did, and gave the following special defense instruction: "In your deliberations, you may not discuss, take into consideration or speculate as to the reason the prior jury reached the verdicts that were rendered in this case. [¶] Your verdict on whether the special circumstance is true or not true must be based solely on the evidence presented to you in this case."

#### (2) *Analysis*

Section 190.4, subdivision (a), provides: "In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach an unanimous verdict that one or more of the special circumstances charged are true, and does not reach an unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury . . . ."

Defendant presents no authority regarding instructing the jury about the principles of homicide at a special circumstance retrial. Generally, "[t]he court has a duty to see to it that the jury are 'adequately informed on the law governing all elements of the case submitted to them to an extent necessary to enable them to perform their function in conformity with the applicable law.' " (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 616, p. 880, quoting *People v. Sanchez* (1950) 35 Cal.2d 522, 528 [219 P.2d 9].) "The court should define sua sponte terms used in statutory definitions of an offense that have a technical or specialized meaning." (5 Witkin & Epstein, Cal. Criminal Law, *supra*, Criminal Trial, § 616, p. 881, citing

---

[34] Defense counsel's major disagreement with the jury instructions was that the court refused to give a general presumption of innocence instruction. This is discussed, *post*, at pages 76–78.

numerous cases.) "Unlike words in common usage [citation], a word of technical or specialized meaning that is used in the statutory definition of an offense should be defined or explained, because this usually constitutes an element of the offense." (5 Witkin & Epstein, Cal. Criminal Law, *supra*, Criminal Trial, § 634, p. 907, citing *People v. Smith* (1978) 78 Cal.App.3d 698, 710 [144 Cal.Rptr. 330].)

We have observed that "special circumstances are *sui generis*— neither a crime, an enhancement, nor a sentencing factor." (*People v. Garcia* (1984) 36 Cal.3d 539, 552 [205 Cal.Rptr. 265, 684 P.2d 826].) However, as to jury instructions, we have also stated, "we do not believe the courts can extend a defendant less protection with regard to the elements of a special circumstance than for the elements of a criminal charge." (*Ibid.*)

In order for a special circumstance allegation to be found true, the defendant must also have first been found guilty of first degree murder. (§ 190.2.) The jury at defendant's special circumstance retrial was instructed with the following version of CALJIC No. 8.81.17 (1984 rev.) (4th ed. 1979): "To find that the special circumstance referred to in these instructions as murder in the commission of a robbery is true, it must be proved: [¶] (1), that the murder was committed while the defendant was engaged in the commission of a robbery; [¶] (2), that the defendant intended to kill a human being; [¶] (3), that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstances referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder."[35] Because a finding of guilt of first degree murder was a necessary precondition to the special circumstance finding, the trial court did not err in instructing on first degree murder, a term that is clearly one of technical or specialized meaning. Furthermore, given the complicated law of homicide and the interrelated specialized legal definitions involved, the trial court did not err in giving the full panoply of homicide instructions. We therefore reject defendant's contention that the trial court had no basis for instructing on homicide apart from the robbery-murder special circumstance itself.

We further note that providing the jury with the full panoply of homicide instructions did not, as defendant implies, violate the prohibition in section 190.4, subdivision (a), against having the second jury retry the issue of defendant's guilt. The trial court gave the homicide instructions at the special

---

[35] The court instructed with the 1984 revision of this instruction because defendant's crime occurred during the *Carlos* window. (See fn. 30, *ante*.)

circumstance retrial so that the jury would understand the scope of its task, not so that it would retry defendant's guilt of the underlying first degree murder. However, even assuming that the jury could have used the homicide instructions to reconsider defendant's guilt of the underlying murder, we fail to see any prejudice to defendant. Any reconsideration by the jury of defendant's guilt of the underlying first degree murder could only have enhanced defendant's chances of being acquitted of the special circumstance allegation.

### b. *Assertedly Erroneous Instruction on Premeditation and Deliberation*

In the alternative, defendant argues that, while instruction on a felony-murder theory of first degree murder might have been appropriate, the trial court should not have also instructed on a theory of premeditated first degree murder because, as defendant further argues, the first jury made special findings that it accepted the felony-murder theory but rejected the premeditation theory. As we conclude below, even assuming that the first jury's verdict amounted to a finding that it accepted a felony-murder theory, the first jury's verdict did not present a finding, express or implied, that the first jury rejected the premeditation theory. Consequently, the trial court did not err in instructing the second jury on premeditated first degree murder.

### (1) *Background*

At the first trial, the trial court used five different verdict forms for the murder count. Verdict form No. 1, which the jury used to convict defendant of first degree murder, contained, in relevant part, a verdict for first degree murder and a verdict for the robbery-murder special circumstance.[36] The first degree murder verdict read: "We, the jury in the above entitled cause, find the defendant Jack Wayne Friend, GUILTY of a felony, to wit: First Degree Murder, a violation of Section 187 of the Penal Code of California, as charged in Count One of the Information." Verdict form No. 2 contained the same verdict for first degree murder with the same phrasing but contained no verdict for the robbery-murder special circumstance. Verdict form No. 3 contained a verdict for second degree murder; verdict form No. 4 contained a verdict for voluntary manslaughter; and verdict form No. 5 contained a verdict of not guilty of murder.

---

[36] Verdict form No. 1 also contained the verdict for the personal use of a knife in the commission of the murder. The distribution of the personal use enhancements on the verdict forms is not relevant to defendant's claim.

The trial court gave the jury detailed instructions on how to use the murder verdict forms. The trial court explained that verdict form No. 1 was "based upon the theory of felony murder, that is, a killing committed during the commission of a robbery," and further explained that the jury could only consider the robbery-murder special-circumstance allegation if the jury accepted this felony-murder theory. If the jury accepted the felony-murder theory, the trial court instructed the jury to go on to decide the special circumstance allegation (which was on the same verdict form) by deciding whether the murder was an intentional killing during the commission of a robbery. However, if the jury had a reasonable doubt whether the killing was done during the commission of the robbery, the trial court instructed the jury to "put away" verdict form No. 1 and "go on to the next verdict" (verdict form No. 2), which was the one for willful, deliberate, and premeditated murder. Verdict form No. 2 did not contain a special circumstance allegation verdict because, as the trial court explained, the theory of first degree murder for this verdict form was not based on felony murder. If the jury had a reasonable doubt as to whether defendant was guilty of first degree murder, the court instructed that the jury should then consider second degree murder, and, if the jury had a reasonable doubt about second degree murder, it should then consider voluntary manslaughter. If the jury wanted to acquit defendant of all the murder charges, the court instructed the jury to use the verdict form finding him not guilty of murder. The court concluded by telling the jury: "Now whatever you do only bring me back one verdict as to each count. Now he's either guilty or not guilty of Count One [Murder], so you can only have one verdict."

### (2) Analysis

Defendant contends that, because of the structure of the murder verdict forms and the trial court's instructions, the fact that the first jury convicted defendant of first degree murder using verdict form No. 1 amounted to a special finding that the jury found defendant guilty on a felony-murder theory. However, even if we accept this contention, we need not and do not accept defendant's further contention that the first jury also made a special finding *rejecting* the theory of premeditated first degree murder. Given the facts of the case, the felony-murder theory and the premeditated murder theory were not mutually exclusive. Indeed the prosecutor had expressly argued the applicability of both theories by contending that defendant committed the murder in the commission of a robbery and had premeditatedly killed the bartender to eliminate him as a witness to that robbery.

The trial court had instructed the jury to return only one verdict form on murder, and also instructed them to begin by considering first degree murder on a felony-murder theory. By the terms of the court's instructions, once the jury agreed to first degree murder on the felony-murder theory, the jury was not required to go on to consider first degree murder on a premeditation theory. Indeed, even if the jury had gone on to consider premeditation, it had no way to express any finding on that theory since it was instructed to sign and return only one of the murder verdict forms. The premeditation theory of first degree murder therefore remained an unadjudicated issue.[37] Because the first jury made no finding rejecting the premeditation theory of first degree murder, the trial court did not err in instructing the second jury with that theory.[38]

### c. *Asserted Directed Verdict*

Defendant contends that, by instructing on both theories of first degree murder, the trial court implied that defendant had been found guilty of both theories by the first jury. This, defendant contends, had the result of directing the verdict, since, if the jury assumed both theories of first degree murder, all the elements of the robbery-murder special-circumstance allegation would necessarily be satisfied. Defendant points to part of the court's instruction that might, read out of context, be seen as implying that defendant had been convicted on both theories.[39] But the record as a whole shows that the trial court clearly indicated to the jury that the two theories were *possible* bases for first degree murder.[40]

---

[37] Defendant failed to raise any objection at the first trial as to the murder verdict forms, let alone request verdict forms that would have required the jury to make special findings as to the two theories of first degree murder.

[38] For the same reason, we reject defendant's related contention, raised for the first time at oral argument, that the trial court committed error, under *People v. Sturm* (2006) 37 Cal.4th 1218 [39 Cal.Rptr.3d 799, 129 P.3d 10] by failing to accurately inform the second jury of the findings made by defendant's first jury. In *Sturm*, we reversed defendant's penalty phase judgment because the trial court had erroneously stated to the penalty phase retrial jury that the jury in defendant's first trial had found him guilty of first degree murder on a premeditation theory. (*Id.* at pp. 1231–1233.) Unlike the trial court in *Sturm*, however, the trial court at defendant's special circumstance retrial made no misstatements about the findings of the first jury. Furthermore, as noted, the trial court expressly instructed the special circumstance retrial jury not to speculate as to the basis of the first jury's verdict of first degree murder.

[39] "Now, you know already that Mr. Friend's been found guilty of murder of the first degree. I've given you definitions of felony murder and first degree murder requiring malice aforethought and premeditation and deliberation, and you also know he's been found guilty of robbery."

[40] In introducing his instructions on the different theories of murder, the court stated: "I'm telling you this because we want you to know the theories that *could* be applied in this case." (Italics added.) Immediately after the statement defendant points to, the court reminded the

### d. *Assertedly Misleading Felony-murder Instruction*

The trial court instructed with the following modified version of CALJIC No. 3.31: "In the crime charged in Count One of the Information, namely Murder, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator, and unless such mental state exists, the crime to which it relates is not committed. [¶] In the crime of Murder, the necessary mental state is to harbor malice aforethought, except in felony murder, where the law imputes malice to a person who kills in perpetration of a robbery or in an attempt to perpetrate a robbery." Defendant contends the trial court erred by referring to malice in connection with felony murder, since our decision in *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*) indicates malice is not an element of felony murder.

■■■ *Dillon*, a plurality opinion by Justice Mosk, addressed whether the felony-murder rule was unconstitutional because it shifted to the defendant the burden of disproving the element of malice. (*Dillon, supra,* 34 Cal.3d at pp. 472–473.) The defendant in *Dillon* pointed to many of our opinions that recited that malice was "presumed" (or similar cognate phrases, including "imputed") by the operation of the felony-murder rule. (*Id.* at p. 473 & fn. 20.) *Dillon* rejected the contention that these traditional phrases in themselves decided the constitutional issue, and concluded that the felony-murder rule did not involve an unconstitutional presumption because the so-called presumption of malice "is no more than a procedural fiction that masks a substantive reality, to wit, that as a matter of law malice is not an element of felony murder." (*Id.* at p. 475.) In supporting this conclusion we noted that our prior "decisions had recognized this reality," and we quoted from a prior opinion which stated, inter alia, that " '[a]ttempts to explain the statute to the jury in terms of nonexistent "conclusive presumptions" tend more to confuse than to enlighten a jury unfamiliar with the inaccurate practice of stating rules of substantive law in terms of rules of evidence.' " (*Ibid.,* quoting *People v. Valentine* (1946) 28 Cal.2d 121, 136 [169 P.2d 1].)

We therefore reject defendant's contention that the trial court committed prejudicial error in instructing the jury that "the law imputes malice to a person who kills in perpetration of a robbery or in an attempt to perpetrate a robbery." First of all, this is not an incorrect description of the law. Even after *Dillon,* we have occasionally used this traditional formula to describe the

---

jury not to "discuss, take into consideration, or speculate as to the reasons the prior jury reached the verdicts that were rendered in this case."

felony-murder rule. (See, e.g., *People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022] ["The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life."], overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1199 [91 Cal.Rptr.3d 106, 203 P.3d 425]; but see *Hansen*, at p. 320 (conc. & dis. opn. of Mosk, J.) [preferring the formulation that the felony-murder rule is a "substitute" for malice aforethought].) Recently, in the course of clarifying the second degree felony-murder rule, we observed that the felony-murder rule generally " 'acts as a substitute' for conscious-disregard-for-life malice," and therefore "describes a different form of malice under section 188." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1184, citing *People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].)

In light of *Dillon*, jury instructions on felony murder should avoid language suggesting that felony murder results in a conclusive presumption of malice. But, there was no danger that the jury would so understand the court's instruction in the instant case. In addressing whether a jury instruction is misleading we consider " 'the entire charge of the court,' " not just a particular instruction or parts of an instruction. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197].) Here, the trial court instructed on murder with CALJIC No. 8.10 (5th ed. 1988), which stated: "Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of robbery, a felony inherently dangerous to human life, is guilty of the crime of murder in violation of Section 187 of the Penal Code." The court also instructed with CALJIC No. 8.21 (5th ed. 1988) on first degree felony murder: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." These two instructions distinguished malice murder from felony murder, explained what the elements of felony murder were, and made it clear that malice aforethought was not an element of felony murder.

### 5. Asserted Failure to Instruct on Presumption of Innocence and Burden of Proof

Defendant contends the trial court erred in modifying the presumption of innocence instruction and in refusing to give a defense special instruction on the burden of proof for the special circumstance allegation. As we conclude below, the court did not err.

### a. *Background*

For the special circumstance retrial, the trial court modified CALJIC No. 2.90 on the presumption of innocence and burden of proof, and CALJIC No. 8.80 on the robbery-murder special circumstance. CALJIC No. 2.90 has two paragraphs, the first setting forth the presumption of innocence, the second defining reasonable doubt.[41] Over the objection of defense counsel, the court omitted the first paragraph, explaining "I'm not giving that because he's already been found guilty. I'm giving the definition of what reasonable doubt is." The defense proposed the following supplemental instruction to CALJIC No. 2.90: "This instruction on presumption of innocence and reasonable doubt applies in this case as follows: [¶] The special circumstance is presumed not to be true until the contrary is proved, and in case of a reasonable doubt whether the truth of the special circumstance is satisfactorily shown, the defendant is entitled to a finding that the special circumstance is not true. [¶] This presumption places upon the People the burden of proving the truth of the special circumstance beyond a reasonable doubt." The court refused this instruction, explaining that it was "properly covered by the CALJIC instructions."

For CALJIC No. 8.80 (5th ed. 1989), the court made the following two unobjected-to substitutions: For "If you find the defendant in this case guilty of murder of the first degree, you must then determine if the following special circumstance is true or not true," the court substituted: "Now, the defendant in this case has been found guilty of murder of the first degree and robbery. You must determine that the following special circumstance is true or not true." For "The People have the burden of proving the truth of a special circumstance," the court substituted: "A special circumstance must be proved beyond a reasonable doubt."

### b. *Analysis*

■ "[T]he failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution." (*Kentucky v. Whorton* (1979) 441 U.S. 786, 789 [60 L.Ed.2d 640, 99 S.Ct. 2088] (per curiam).) In addressing this issue we have followed the United States

---

[41] " A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (CALJIC No. 2.90 (5th ed. 1988).)

Supreme Court's approach in *Taylor v. Kentucky* (1978) 436 U.S. 478 [56 L.Ed.2d 468, 98 S.Ct. 1930]. "[D]ue process does not mandate the 'use of the particular phrase "presumption of innocence"—or any other form of words . . . .' [Citations.] Rather, this traditional formulation 'simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial.' [Citation.] Accordingly, we decline defendant's implicit invitation to confine instruction on the presumption of innocence to any rigid or narrowly precise terms. [Citation.] As long as the court's charge to the jury conveys the substance of the principle, it will satisfy due process." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 72 [14 Cal.Rptr.2d 133, 841 P.2d 118], quoting *Taylor v. Kentucky, supra,* 436 U.S. at pp. 485–486.)

We therefore reject defendant's contention that the omission of the traditional presumption of innocence language violated defendant's due process rights. As recounted above, the court properly instructed the jury pursuant to CALJIC No. 8.80 that "[a] special circumstance must be proved beyond a reasonable doubt." The court properly instructed on the definition of reasonable doubt, giving the second paragraph of CALJIC No. 2.90. The court also instructed the jury pursuant to CALJIC No. 2.11.5 that its "sole duty is to decide whether the People have proved the truth of the special circumstance in this trial" and pursuant to CALJIC No. 2.61 that "the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him." These instructions conveyed the substance of the principle of the presumption of innocence. (*People v. Hawthorne, supra,* 4 Cal.4th at p. 72.)

Defendant also criticizes the court's decision to delete the presumption of innocence language from CALJIC No. 2.90 as being inexplicable. But the court made its reasoning clear. Defendant had been found guilty of first degree murder and the other charges in the first trial. As discussed above, section 190.4, subdivision (a) prohibited the jury from reconsidering defendant's guilt for these charges in the special circumstance retrial. The court considered that the traditional presumption of innocence language in the first paragraph of CALJIC No. 2.90 might cause the jurors to violate section 190.4, subdivision (a) or otherwise confuse them as to the scope of their duty in the special circumstance retrial. The court therefore decided to omit the first paragraph of CALJIC No. 2.90 based on those concerns.

### 6. Assertedly Erroneous Instruction on the Robbery-murder Special Circumstance

As discussed and quoted above, *ante,* at page 71, the trial court instructed with CALJIC No. 8.81.17 on the robbery-murder special circumstance.

Defendant contends the lack of the conjunction "and" between the three elements of the instruction led the jury to believe that there was an implied "or" (disjunctive) between the three elements, and that the instruction therefore impermissibly allowed the jury to find the special circumstance allegation true based on only one element.[42]

 Using the disjunctive "or" between the elements of CALJIC No. 8.81.17 would indeed be inappropriate. (*People v. Raley* (1992) 2 Cal.4th 870, 903 [8 Cal.Rptr.2d 678, 830 P.2d 712].) But the trial court did not use the disjunctive. Defendant's contention is that the lack of any grammatical connectors between the elements made the instruction unclear and misled the jury. When reviewing a claim based on assertedly ambiguous instructions, we inquire whether the jury was reasonably likely to have construed them in a manner that violates the defendant's rights. (*People v. Rogers* (2006) 39 Cal.4th 826, 873 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Applying this standard, we conclude it was not reasonably likely the jury understood the elements to be in the disjunctive. Absent the insertion of express disjunctives, the listing of three separate elements that must be proved clearly implied that proof of *each* was independently necessary. We therefore reject defendant's contention.

### C. Second Trial: Penalty Phase

#### 1. Asserted Prosecutorial Misconduct

##### a. Asserted Improper Comment

Defendant contends the prosecutor engaged in misconduct by commenting during the examination of a witness that defendant was a "danger" while in prison. The prosecution had called Sheriff's Deputy Allen Boyd, who was in charge of classifying prisoners at the jail where defendant was incarcerated while awaiting trial. Boyd had interviewed defendant after he had threatened to stab fellow inmate Mario Holland in the neck with a pair of fingernail clippers. Boyd said defendant warned that some of the other inmates in his pod were antagonizing him and that someone would get killed because he

---

[42] As noted, *ante*, at footnote 35, the court instructed with the 1984 revised version of the instruction, which had no grammatical connectives between the three elements. Defendant is correct that the 1991 revised version, which was available when the court instructed the jury on June 19, 1992, added the word "and" between the elements. As noted, *ante*, at footnote 35, the reason the court instructed with the 1984 revised version was that defendant's crime occurred during the *Carlos* window, when intent to kill was an element of the robbery-murder special circumstance.

would kill someone before he got hurt or killed himself. The prosecutor then asked whether and why Boyd had reclassified defendant after receiving this information, and defense counsel successfully objected to this line of questioning as irrelevant. The court noted that Boyd's reclassification of defendant was not an aggravating factor, to which the prosecutor replied, "Because Mr. Friend is a danger——." The trial court cut him off, informed the jurors to disregard the comment, and instructed them that it was their job to decide whether or not defendant was a danger. Later, outside of the presence of the jury, defense counsel moved for a mistrial. The trial court acknowledged that it was inappropriate for the prosecutor to have said that defendant was a danger, but overruled the motion because the trial court had adequately admonished the jury as to the comment. We agree with the trial court. The prosecutor's comment constituted error, but the court's admonition cured any prejudice to defendant.

b. *Asserted Improper Cross-examination of Defendant at the Penalty Phase*

Defendant contends the prosecutor engaged in misconduct by improperly cross-examining defendant on various topics including his tattoos, his interest in Satanism, the Ku Klux Klan, and statements that defendant had allegedly made to several of his probation officers.[43] Defense counsel unsuccessfully objected to many of these questions on grounds of relevance. On appeal, defendant contends the prosecutor's questions on these topics were misconduct because he did not have a good faith belief in the facts underlying the questions. As we have stated, " 'It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 562 [127 Cal.Rptr.2d 802, 58 P.3d 931], quoting *People v. Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218].) " 'But if the defense does not object, and the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct has occurred. [Citation.] Therefore, a claim of misconduct on this basis is waived absent a timely and specific objection during the trial.' " (*People v. Bolden, supra,* 29 Cal.4th at p. 562, quoting *People v. Price* (1991) 1 Cal.4th 324, 481 [3 Cal.Rptr.2d 106, 821 P.2d 610].) As we conclude below, defendant's claim is forfeited because trial counsel failed to object on this ground. Moreover, the requisite "good faith" can be inferred from the record because "the factual specificity of the prosecutor's questions implies that they were based on information obtained during the prosecution's review of

---

[43] Defendant also challenges the trial court's denial of defense objections to the relevance of these topics, which is discussed *post* in part II.C.1.b.

records available to the defense . . . ." (*People v. Hughes, supra,* 27 Cal.4th at p. 388; see *People v. Mickle* (1991) 54 Cal.3d 140, 191 [284 Cal.Rptr. 511, 814 P.2d 290].)

### (1) *Tattoos and Books on Satanism*

On direct examination, defendant stated that he was missing some teeth. On cross-examination, the prosecutor asked defendant whether that was because of tattoos inside his mouth. Defendant answered no, and the prosecutor asked him what was tattooed inside of his mouth. Defense counsel's objection was overruled. The prosecutor asked, "It's 'fuck you,' isn't it?" Defendant answered, "I don't know. Is it?" Defense counsel objected that the question was irrelevant and beyond the scope of direct examination, but was overruled. The court ruled the questions were permissible cross-examination because they pertained to defendant's testimony about his religious leanings. The court sustained a defense objection to the prosecutor's next question of what defendant had tattooed on his penis, but allowed the question of how many times defendant had tattooed "fuck you" on his body. Defendant refused to answer that question, and the court instructed the jury that it could take into consideration the fact that defendant refused to answer a question in assessing his credibility in the case.

The prosecutor then asked defendant whether he had possessed any books on Satanism in his cell since his incarceration. Defense counsel objected, once again on relevancy grounds and as beyond the scope of direct examination. The trial court overruled the objection, noting again that defendant had emphasized his Christianity in his direct testimony. Defendant stated he did have such books because he was researching Satanism and its effect on people.

As noted, defense counsel only objected on the ground of relevance, not on the ground that the prosecutor had no factual basis for these lines of questioning, and defendant therefore has forfeited his claim. Moreover, on the merits, we infer the prosecutor had a good faith belief in the factual basis of his questions because of the factual specificity of his questions. (*People v. Hughes, supra,* 27 Cal.4th at p. 388; *People v. Mickle, supra,* 54 Cal.3d at p. 191.)

### (2) *Ku Klux Klan and Other White Supremacist Groups*

Without objection, the prosecutor asked defendant whether he had been a member of the Ku Klux Klan, and defendant answered yes. The prosecutor sought to ask defendant whether he was a White supremacist or member of

the J. B. Stoner's National States Rights Party, but the court sustained defense relevancy objections. Because defendant failed to object below on the basis the prosecutor lacked a good faith belief in a factual basis for these questions, he has forfeited his claim for purpose of this appeal. Moreover, the jury was admonished to disregard the prosecutor's reference to the J. B. Stoner's National States Rights Party, so defendant was not prejudiced.

### (3) Letters to Probation Officers

The prosecutor asked defendant whether he had made statements to several of his probation officers in the past indicating his intention to reform himself based on his religious convictions, and showed him letters in which the purported statements were made. Defendant denied authorship of both letters. Defense counsel objected to the second letter on the grounds that it was not written by defendant and had not been authenticated. The court ruled that defense counsel could question defendant about whether he had ever made the representations indicated in the letter, which defendant then also denied making. Although defense counsel strenuously objected on the grounds that defendant had not in fact written the letter, counsel never objected that the prosecutor had no good faith basis to believe that defendant wrote the letter or made the representations contained therein. Defendant's claim is therefore forfeited. Moreover, on the merits, because of the specificity of the questions and the exhibition of the letters themselves, we infer the prosecutor had a good faith belief in the factual basis of his questions. (*People v. Hughes*, *supra*, 27 Cal.4th at p. 388; *People v. Mickle*, *supra*, 54 Cal.3d at p. 191.)

Indeed, during his closing argument, the prosecutor indicated his basis for believing the letter to have been written by defendant, when he represented that it had been in defendant's court file. Defendant contends that, since the letter was never authenticated, by so stating the prosecutor was offering his own unsworn testimony and vouching for otherwise inadmissible evidence. Defense counsel did not object specifically to the prosecutor's statement, which came after counsel objected to the prosecutor's reference to the statements in the letter in closing argument as misstating the evidence (because defendant had denied making them). Defendant's claim is therefore forfeited. Moreover, on the merits, we see no prejudice. The prosecutor erred in stating factual support for the provenance of the letter that was not based on the evidence. However, the trial court made clear that the issue was whether defendant had ever made the representations made in the letter, not whether defendant had written the letter. The jury heard defendant's testimony that he had not made such representations.

c. *Misstatements and Misrepresentations of Evidence of Aggravating Factors*

(1) *Arson and Attempted Train-wrecking Incidents*

When the court and parties met to review the admissibility of the proposed aggravating evidence, the prosecutor informed the court that he had no evidence for two of the incidents in his notice: No. 20 ("attempted to derail a train") and No. 21 ("attempted to [ignite] a rag . . . in the heater area of a public pool"). The prosecutor nonetheless raised these two incidents while cross-examining defendant. After referring to defendant's testimony that he had sniffed glue as a young man, the prosecutor asked him, without objection, whether he was sniffing glue when he and a friend set fire to the pump house of a public swimming pool in 1970 in Los Angeles. Defendant admitted being present when the fire was started, but asserted someone else caused it. The prosecutor later asked defendant what substance he was abusing in 1970 when he and his brother attempted to wreck a train in Los Angeles in order to rob the passengers. Defense counsel unsuccessfully objected that the question was irrelevant and beyond the scope of direct examination. Defendant acknowledged that he and his brother used to place a choke chain on the train tracks so the train would flatten it and he could hang it off his bicycle as a decoration, but denied trying to wreck the train.

Defendant contends that, because the prosecutor did not raise these incidents in his case in aggravation, he was estopped from cross-examining defendant about them. But defendant cites no authority to support his position. Both incidents were relevant to defendant's conduct while under the possible influence of drugs, an issue defendant raised in his testimony, and therefore were proper subjects of cross-examination.

(2) *Plan to Escape*

Defendant contends that, during his summation, the prosecutor misrepresented the evidence concerning defendant's plan to escape from jail. The prosecutor had called inmate Roger Rosenberg to testify about a conversation between defendant and another inmate that Rosenberg had overheard in which defendant remarked that security at the jail wing of Highland Hospital was loose, and that defendant was going to try to get away from Highland with the help of his brother. Rosenberg stated the plan involved defendant's brother's being armed with a weapon. Rosenberg also stated that defendant discussed an alternate plan, in which defendant's brother would bring a gun

to court to effect defendant's escape. In his closing argument, the prosecutor referred to Rosenberg's testimony as stating that defendant had said he was trying to get his brother to bring a gun to this courtroom to effect an escape by killing a deputy marshal.

Defendant contends the prosecutor misrepresented Rosenberg's testimony by adding the details that defendant was planning to escape from the present courtroom and to kill a deputy marshal. While it is true that these details were not present in Rosenberg's testimony, the prosecutor was entitled to draw reasonable inferences, such as that the courtroom to be escaped from was the present trial court, and that a deputy would be killed in the course of the escape. Furthermore, we see no prejudice to defendant. As noted, the trial court instructed the jury that the arguments of counsel were not evidence, and that the jury should rely on its own recollection of a witness's testimony.

### d. *Attacks on Defendant and Defense Witnesses*

Defendant contends the prosecutor engaged in misconduct by characterizing defendant as an "insidious little bastard," with "no redeeming social value," and being "without feeling" and "without sensitivity." Because trial counsel failed to object, the claim is forfeited on appeal. Moreover, we do not find the prosecutor's comments about lack of social value, feeling, and sensitivity rise to the level of misconduct given the brutal and violent nature of the stabbing murder here. (See *People v. Stanley* (2006) 39 Cal.4th 913, 953 [47 Cal.Rptr.3d 420, 140 P.3d 736].) As to the prosecutor's use of an insulting epithet, even assuming it crossed the line between vigorous argument and unjustified insult, we conclude that it would not have inflamed the jury, given the facts in this case.

Defendant also contends the prosecutor improperly offered his own opinion when he stated that defendant had "an antisocial personality," and that he was a "sociopath," "without feeling." Once again, trial counsel failed to object, and the claim is therefore forfeited on appeal. On the merits, the prosecutor was using language in common currency to describe his interpretation of the evidence, not improperly stating an expert opinion. (See *People v. Zambrano*, *supra*, 41 Cal.4th at p. 1173 ["label of sociopath," meaning "someone who acts without conscience or remorse," appropriate when based on the facts of the crime].)

Defendant contends the prosecutor engaged in misconduct by expressing animosity toward various defense witnesses, the most notable being his

reference to defense expert witness Dr. Basford as "that charlatan" in closing argument. Defendant forfeited this claim by failing to object. Furthermore, the gist of the prosecutor's argument was that Basford was not qualified to render an expert opinion about neurology and that he had only infrequent contact with defendant during the three years he claimed to be treating him. Even assuming that the epithet "charlatan" improperly suggested fraud or other unethical conduct, we conclude there was no prejudice.

### 2. *Assertedly Improper Admission of Evidence*

Defendant contends the trial court erred in allowing the prosecutor to cross-examine defendant's former defense attorney, Susan Sawyer, about her relationship with defendant, and in allowing the prosecutor to call former courtroom bailiff, Kathleen Boyovich, to impeach Sawyer's testimony. Defendant also contends the trial court erred in permitting the prosecutor to inquire about defendant's vulgar tattoos, and about statements that defendant had assertedly made to his former probation officers about reforming himself.

#### a. *Testimony of Susan Sawyer*

##### (1) *Background*

Defense counsel called Susan Sawyer during the penalty phase. She testified that, when she represented defendant during his first trial, she frequently met with him in the same room without any sheriffs present and never felt physically threatened. She maintained contact with defendant even after their professional relationship terminated at the end of his first trial. She considered his "redeeming qualities" to be that he was a hard worker, showed talent in his art projects, and had written her several thank you notes. In cross-examination, the prosecutor asked Sawyer whether she had any romantic feelings towards defendant, which she denied. Defense counsel's objection to the question was overruled on the ground that it went towards the issue of the witness's bias or motive. She also denied having any maternal feelings towards defendant. When asked whether she had ever touched defendant other than with a handshake, she stated she had touched him on the shoulder.

##### (2) *Analysis*

Evidence Code section 780 permits a jury to "consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . : [¶] . . . [¶] . . . [t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f).) Defendant contends that because Sawyer had defended defendant in his first trial, her bias or interest was

already apparent, and that there was no basis for introducing additional evidence of bias. But the prosecutor's cross-examination of Sawyer went towards bias based on a personal rather than a professional relationship. The prosecutor's questioning therefore was not cumulative. Furthermore, to the extent that defendant contends Evidence Code section 780 limits inquiry into only one type of bias at a time, he presents no authority for that proposition.

b. *Testimony of Kathleen Boyovich*

(1) *Background*

Outside the presence of the jury, the prosecutor indicated his intention to call former courtroom bailiff, Kathleen Boyovich, in rebuttal to testify that Sawyer's physical contact with defendant "was more of a caressing nature" than Sawyer indicated in her testimony. The court overruled defense counsel's relevancy objection, stating the testimony could go towards Sawyer's bias, interest, or prejudice. The court also denied defense counsel's request to have the court hear Boyovich's testimony first to determine its probative value.

Boyovich testified that Sawyer engaged in "a lot of physical contact with him," that she was constantly "fixing his hair or rubbing his head," and that she constantly put her left arm around him. The prosecutor asked Boyovich whether the physical contact disturbed her, to which she answered yes. Defense counsel objected, and the trial court overruled the objection on the basis that Boyovich had been in charge of security in the courtroom. Boyovich testified that the type of physical contact she saw between Sawyer and defendant was something she had never seen between a lawyer and client in her time at the court.

In a relatively lengthy cross-examination, defense counsel asked Boyovich to clarify what it was about Sawyer's behavior that disturbed her. Initially interpreting the question as relating to her personal feelings, she stated that she was "repulsed" by the behavior, and when pressed as to why she would be offended that "someone expressed affection" to someone who was on trial, she stated that it was probably because that someone was Jack Friend. She added that her reaction to Sawyer's behavior was also based on the fact that she had "never seen that kind of relationship between an attorney and a client." Focusing on why Sawyer's behavior concerned Boyovich from the perspective of security, defense counsel asked whether the physical contact concerned her because she was thought that Sawyer was going to pass

defendant a weapon. Boyovich answered that she was not worried about that, but mentioned that at one point she had prevented Sawyer from passing coffee to defendant, since "hot coffee could be used as weapon." Defense counsel asked her whether she was the only bailiff present in the courtroom during the time she served at defendant's trial. Unable to remember specifically, she surmised there must have been a second deputy based on defendant's jail classification at the time, which was administrative segregation. Pressed by defense counsel to describe whether and how defendant had ever presented a security threat to her in the courtroom, she stated that "there was a high security level used with Jack Friend based on his past record while in custody," and that "you had to be security conscious with him around based on his record while in custody."

### (2) *Analysis*

■ Defendant contends the court erred in allowing the prosecution to call Boyovich as a rebuttal witness because her testimony was irrelevant and cumulative. However, the scope of rebuttal lies within the trial court's discretion. (*People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708], superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106 [77 Cal.Rptr.3d 287, 183 P.3d 1250].) Boyovich's testimony was relevant to impeach Sawyer's testimony about the way she touched defendant, which in turn was relevant to whether she was biased because of a personal relationship with him. Defendant contends the trial court erred in denying defendant's request for a hearing concerning Boyovich's testimony outside the presence of the jury, either under Evidence Code section 402 or under *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423]. But a hearing was required under neither. ■ Evidence Code section 400 et seq. sets forth the rules for determining the existence or nonexistence of a preliminary fact when the parties dispute its existence. (*People v. Hoyos* (2007) 41 Cal.4th 872, 897 [63 Cal.Rptr.3d 1, 162 P.3d 528].) With respect to Boyovich's testimony, there was no disputed preliminary fact at issue. In *Phillips*, we admonished that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element . . ." of other violent crimes the prosecution intends to introduce in aggravation under section 190.3, factor (b). (*People v. Phillips, supra,* 41 Cal.3d at p. 72, fn. 25; see *People v. Boyer, supra,* 38 Cal.4th at p. 476, fn. 48.) But Boyovich's testimony was offered in rebuttal to Sawyer's; it did not involve evidence of other violent crimes the prosecutor intended to offer in aggravation.

In a related argument, defendant contends Boyovich's testimony amounted to unauthorized evidence in aggravation, of which defendant was given no notice. Defendant contends Boyovich's testimony was damaging to defendant because she indicated her personal repugnance towards defendant, described his jail security classification, and described her security concerns in the courtroom based on that classification, including the possibility that he might use hot coffee as a weapon. Defendant may be correct that none of these details was particularly flattering, but he is precluded from assigning error to the court or the prosecutor because all of the testimony he now complains of was elicited in the course of defense counsel's cross-examination of Boyovich.

### c. Questions About Defendant's Vulgar Tattoos

As described, *ante*, at page 80, in cross-examination, the prosecutor asked defendant whether he had a vulgar phrase tattooed in his mouth and on other parts of his body. The trial court overruled defense objections to the questions on the ground the questions were permissible cross-examination because they pertained to defendant's testimony about his religious convictions. Defendant contends there is simply no connection between defendant's profession of his Christian beliefs and his having vulgar tattoos on his body. Even assuming the presence of these tattoos was irrelevant to defendant's currently professed Christian beliefs, we see no prejudice. Defendant's own testimony at the penalty phase painted himself as being from the proverbial "wrong side of the tracks," and the jury would not have been inflamed by learning that defendant had tattoos, even vulgar ones.

### d. Questions About Defendant's Alleged Past Claims to Reform Himself

As described, *ante*, at page 81, in cross-examination, the prosecutor asked defendant whether he had made statements to several of his past probation officers indicating his intention to reform himself based on his religious convictions, and showed him letters in which the purported statements were made. Defendant contends that, because the letters were not authenticated, the trial court erred in allowing the prosecutor to ask defendant about the representations in the letters. But the basis of the court's ruling was that the prosecutor could ask defendant about the sentiments made in the letters regardless of whether defendant had written those particular letters. To the extent that defense counsel objected only on the basis of defendant's actual authorship of the letters, defendant's claim concerning the relevance of the

statements themselves is forfeited. Furthermore, on the merits, we reject defendant's claim that the prosecutor's questions about defendant's past claims of religious conversion should have been excluded as irrelevant. Defendant had made his commitment to Christianity since his incarceration the center of his testimony in mitigation. Therefore the prosecutor was permitted to inquire whether defendant had made professions of religious commitment in the past that he had failed to keep.

### 3. Challenges to California's Death Penalty Law

Defendant raises various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows: The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review not required by the federal Constitution].)

The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish a standard of proof—for finding the existence of an aggravating factor, or because it does not require the jury to find that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Geier* (2007) 41 Cal.4th 555, 618 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182].) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey, supra,* 530 U.S. 466) have not altered our conclusions in this regard. (*People v. Salcido* (2008) 44 Cal.4th 93, 167 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *People v. Hoyos, supra,* 41 Cal.4th at p. 926.)

The penalty phase instructions were not defective in failing to assign a burden of persuasion regarding the jury's penalty decision (*People v. Smith* (2005) 35 Cal.4th 334, 370–371 [25 Cal.Rptr.3d 554, 107 P.3d 229]), or in failing to require juror unanimity on the aggravating factors (*People v. Abilez, supra,* 41 Cal.4th at p. 533).

The phrases "so substantial" and "warranted" in CALJIC No. 8.88 are not unconstitutionally vague. (*People v. Salcido, supra*, 44 Cal.4th at p. 117; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Arias* (1996) 13 Cal.4th 92, 170–171 [51 Cal.Rptr.2d 770, 913 P.2d 980].) CALJIC No. 8.88 is not defective for failing to inform the jury as to which side bore the burden of persuading it of the appropriateness or inappropriateness of a penalty of death in the case. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 124.) Nor was the court required to instruct the jury that if the aggravating circumstances did not outweigh those in mitigation, a sentence of life without the possibility of parole was mandatory. (*Ibid.*)

Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty. (*People v. Guerra, supra*, 37 Cal.4th at p. 1165.) The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b). (*People v. Panah* (2005) 35 Cal.4th 395, 499 [25 Cal.Rptr.3d 672, 107 P.3d 790].) The court need not delete inapplicable statutory factors or designate aggravating and mitigating factors. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531].) The use of the certain adjectives such as "extreme" and "substantial" in the list of mitigating factors in section 190.3 does not render the statute unconstitutional. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) Written findings regarding the aggravating factors are not constitutionally required. (*Id.* at p. 275.)

The death penalty law does not deny capital defendants equal protection. (*People v. Hinton* (2006) 37 Cal.4th 839, 913 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*People v. Guerra, supra*, 37 Cal.4th at p. 1164.)

D. *Cumulative Error*

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors requires reversal of his conviction and death sentence even if none of the errors is prejudicial individually. We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

### III. DISPOSITION

The guilt and penalty judgments are affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 26, 2009.